## SHAPIRO, COMMISSIONER OF WELFARE OF CONNECTICUT *v.* THOMPSON.

No. 9.   Argued May 1, 1968.—Reargued October 23–24, 1968.—
Decided April 21, 1969.*

*Together with No. 33, *Washington et al.* v. *Legrant et al.,* on appeal from the United States District Court for the District of Columbia, argued May 1, 1968, and No. 34, *Reynolds et al.* v. *Smith et al.,* on appeal from the United States District Court for the Eastern District of Pennsylvania, argued May 1–2, 1968, both reargued on October 23–24, 1968.

620

*Francis J. MacGregor,* Assistant Attorney General of Connecticut, argued the cause for appellant in No. 9 on the original argument and on the reargument. With him on the brief on the original argument was *Robert K. Killian,* Attorney General. *Richard W. Barton* argued the cause for appellants in No. 33 on the original argument and on the reargument. With him on the brief on the original argument were *Charles T. Duncan* and *Hubert B. Pair. William C. Sennett,* Attorney General of Pennsylvania, argued the cause for appellants in No. 34 on the original argument and on the reargument. With him on the brief on the reargument was *Edgar R. Casper,* Deputy Attorney General, 'and on the original argument were *Mr. Casper* and *Edward Friedman.*

*Archibald Cox* argued the cause for appellees in all three cases on the reargument. With him on the brief were *Peter S. Smith* and *Howard Lesnick. Brian L. Hollander* argued the cause *pro hac vice* for appellee in No. 9 on the original argument. With him on the brief were *Norman Dorsen* and *William D. Graham. Mr. Smith* argued the cause for appellees in No. 33 on the original argument. With him on the brief were *Joel J. Rabin, Jonathan Weiss,* and *Joseph F. Dugan. Thomas K. Gilhool* argued the cause *pro hac vice* for appellees in No. 34 on the original argument. With him on the brief were *Harvey N. Schmidt, Paul Bender,* and *Mr. Lesnick.*

*Lorna Lawhead Williams,* Special Assistant Attorney General, argued the cause for the State of Iowa as *amicus curiae* in support of appellants in all three cases on the original argument and on the reargument. With

her on the briefs on the original argument was *Richard C. Turner,* Attorney General.

Briefs of *amici curiae* in support of appellant in No. 9 were filed by *David P. Buckson,* Attorney General, and *Ruth M. Ferrell,* Deputy Attorney General, for the State of Delaware; by *William B. Saxbe,* Attorney General, *Winifred A. Dunton,* Assistant Attorney General, and *Charles S. Lopeman* for the State of Ohio; by *Crawford C. Martin,* Attorney General, *Nola White,* First Assistant Attorney General, *A. J. Carubbi, Jr.,* Executive Assistant Attorney General, and *J. C. Davis, John Reeves,* and *Pat Bailey,* Assistant Attorneys General, for the State of Texas; and by *Thomas C. Lynch,* Attorney General, and *Elizabeth Palmer,* Deputy Attorney General, for the State of California.

Briefs of *amici curiae* in support of appellee in No. 9 were filed by *Arthur L. Schiff* for Bexar County Legal Aid Association; by *Eugene M. Swann* for the Legal Aid Society of Alameda County; and by *A. L. Wirin, Fred Okrand, Laurence R. Sperber,* and *Melvin L. Wulf* for the American Civil Liberties Union et al. Brief of *amicus curiae* in support of appellees in No. 33 was filed by *John F. Nagle* for the National Federation of the Blind. Briefs of *amici curiae* in support of appellees in all three cases were filed by *J. Lee Rankin* and *Stanley Buchsbaum* for the City of New York; by *Joseph B. Robison, Carlos Israels,* and *Carl Rachlin* for the American Jewish Congress et al.; and by *Charles L. Hellman* and *Leah Marks* for the Center on Social Welfare Policy and Law et al.

MR. JUSTICE BRENNAN delivered the opinion of the Court.

These three appeals were restored to the calendar for reargument. 392 U. S. 920 (1968). Each is an appeal from a decision of a three-judge District Court holding

unconstitutional a State or District of Columbia statutory provision which denies welfare assistance to residents of the State or District who have not resided within their jurisdictions for at least one year immediately preceding their applications for such assistance.[1] We affirm the judgments of the District Courts in the three cases.

## I.

In No. 9, the Connecticut Welfare Department invoked § 17–2d of the Connecticut General Statutes [2] to

---

[1] Accord: *Robertson* v. *Ott,* 284 F. Supp. 735 (D. C. Mass. 1968); *Johnson* v. *Robinson,* Civil No. 67–1883 (D. C. N. D. Ill., Feb. 20, 1968); *Ramos* v. *Health and Social Services Bd.,* 276 F. Supp. 474 (D. C. E. D. Wis. 1967); *Green* v. *Dept. of Pub. Welfare,* 270 F. Supp. 173 (D. C. Del. 1967). Contra: *Waggoner* v. *Rosenn,* 286 F. Supp. 275 (D. C. M. D. Pa. 1968); see also *People ex rel. Heydenreich* v. *Lyons,* 374 Ill. 557, 30 N. E. 2d 46 (1940).

All but one of the appellees herein applied for assistance under the Aid to Families with Dependent Children (AFDC) program which was established by the Social Security Act of 1935. 49 Stat. 627, as amended, 42 U. S. C. §§ 601–609. The program provides partial federal funding of state assistance plans which meet certain specifications. One appellee applied for Aid to the Permanently and Totally Disabled which is also jointly funded by the States and the Federal Government. 42 U. S. C. §§ 1351–1355.

[2] Conn. Gen. Stat. Rev. § 17–2d (1965 Supp.), now § 17–2c, provides:

"When any person comes into this state without visible means of support for the immediate future and applies for aid to dependent children under chapter 301 or general assistance under part I of chapter 308 within one year from his arrival, such person shall be eligible only for temporary aid or care until arrangements are made for his return, provided ineligibility for aid to dependent children shall not continue beyond the maximum federal residence requirement."

An exception is made for those persons who come to Connecticut with a bona fide job offer or are self-supporting upon arrival in the State and for three months thereafter. 1 Conn. Welfare Manual, c. II, §§ 219.1–219.2 (1966).

deny the application of appellee Vivian Marie Thompson for assistance under the program for Aid to Families with Dependent Children (AFDC). She was a 19-year-old unwed mother of one child and pregnant with her second child when she changed her residence in June 1966 from Dorchester, Massachusetts, to Hartford, Connecticut, to live with her mother, a Hartford resident. She moved to her own apartment in Hartford in August 1966, when her mother was no longer able to support her and her infant son. Because of her pregnancy, she was unable to work or enter a work training program. Her application for AFDC assistance, filed in August, was denied in November solely on the ground that, as required by § 17–2d, she had not lived in the State for a year before her application was filed. She brought this action in the District Court for the District of Connecticut where a three-judge court, one judge dissenting, declared § 17–2d unconstitutional. 270 F. Supp. 331 (1967). The majority held that the waiting-period requirement is unconstitutional because it "has a chilling effect on the right to travel." *Id.,* at 336. The majority also held that the provision was a violation of the Equal Protection Clause of the Fourteenth Amendment because the denial of relief to those resident in the State for less than a year is not based on any permissible purpose but is solely designed, as "Connecticut states quite frankly," "to protect its fisc by discouraging entry of those who come needing relief." *Id.,* at 336–337. We noted probable jurisdiction. 389 U. S. 1032 (1968).

In No. 33, there are four appellees. Three of them— appellees Harrell, Brown, and Legrant—applied for and were denied AFDC aid. The fourth, appellee Barley, applied for and was denied benefits under the program for Aid to the Permanently and Totally Disabled. The denial in each case was on the ground that the applicant had not resided in the District of Columbia for one year

immediately preceding the filing of her application, as required by § 3–203 of the District of Columbia Code.[3]

Appellee Minnie Harrell, now deceased, had moved with her three children from New York to Washington in September 1966. She suffered from cancer and moved to be near members of her family who lived in Washington.

Appellee Barley, a former resident of the District of Columbia, returned to the District in March 1941 and was committed a month later to St. Elizabeths Hospital as mentally ill. She has remained in that hospital ever since. She was deemed eligible for release in 1965, and a plan was made to transfer her from the hospital to a foster home. The plan depended, however, upon Mrs. Barley's obtaining welfare assistance for her support. Her application for assistance under the program for Aid to the Permanently and Totally Disabled was denied because her time spent in the hospital did not count in determining compliance with the one-year requirement.

Appellee Brown lived with her mother and two of her three children in Fort Smith, Arkansas. Her third child was living with appellee Brown's father in the District of Columbia. When her mother moved from Fort Smith to Oklahoma, appellee Brown, in February 1966, returned to the District of Columbia where she had lived as a child. Her application for AFDC assistance was approved insofar as it sought assistance for the child who

---

[3] D. C. Code Ann. § 3–203 (1967) provides:

"Public assistance shall be awarded to or on behalf of any needy individual who either (a) has resided in the District for one year immediately preceding the date of filing his application for such assistance; or (b) who was born within one year immediately preceding the application for such aid, if the parent or other relative with whom the child is living has resided in the District for one year immediately preceding the birth; or (c) is otherwise within one of the categories of public assistance established by this chapter." See D. C. Handbook of Pub. Assistance Policies and Procedures, HPA–2, EL 9.1, I, III (1966) (hereinafter cited as D. C. Handbook).

had lived in the District with her father but was denied to the extent it sought assistance for the two other children.

Appellee Legrant moved with her two children from South Carolina to the District of Columbia in March 1967 after the death of her mother. She planned to live with a sister and brother in Washington. She was pregnant and in ill health when she applied for and was denied AFDC assistance in July 1967.

The several cases were consolidated for trial, and a three-judge District Court was convened.[4] The court, one judge dissenting, held § 3–203 unconstitutional. 279 F. Supp. 22 (1967). The majority rested its decision on the ground that the one-year requirement was unconstitutional as a denial of the right to equal protection secured by the Due Process Clause of the Fifth Amendment. We noted probable jurisdiction. 390 U. S. 940 (1968).

In No. 34, there are two appellees, Smith and Foster, who were denied AFDC aid on the sole ground that they had not been residents of Pennsylvania for a year prior to their applications as required by § 432 (6) of the

---

[4] In *Ex parte Cogdell*, 342 U. S. 163 (1951), this Court remanded to the Court of Appeals for the District of Columbia Circuit to determine whether 28 U. S. C. § 2282, requiring a three-judge court when the constitutionality of an Act of Congress is challenged, applied to Acts of Congress pertaining solely to the District of Columbia. The case was mooted below, and the question has never been expressly resolved. However, in *Berman* v. *Parker*, 348 U. S. 26 (1954), this Court heard an appeal from a three-judge court in a case involving the constitutionality of a District of Columbia statute. Moreover, three-judge district courts in the District of Columbia have continued to hear cases involving such statutes. See, *e. g.*, *Hobson* v. *Hansen*, 265 F. Supp. 902 (1967). Section 2282 requires a three-judge court to hear a challenge to the constitutionality of "*any* Act of Congress." (Emphasis supplied.) We see no reason to make an exception for Acts of Congress pertaining to the District of Columbia.

Pennsylvania Welfare Code.[5] Appellee Smith and her five minor children moved in December 1966 from Delaware to Philadelphia, Pennsylvania, where her father lived. Her father supported her and her children for several months until he lost his job. Appellee then applied for AFDC assistance and had received two checks when the aid was terminated. Appellee Foster, after living in Pennsylvania from 1953 to 1965, had moved with her four children to South Carolina to care for her grandfather and invalid grandmother and had returned to Pennsylvania in 1967. A three-judge District Court for the Eastern District of Pennsylvania, one judge dissenting, declared § 432 (6) unconstitutional. 277 F. Supp. 65 (1967). The majority held that the classification established by the waiting-period requirement is "without rational basis and without legitimate purpose or function" and therefore a violation of the Equal Protection Clause. *Id.,* at 67. The majority noted further that if the purpose of the statute was "to erect a barrier against the movement of indigent persons into the State or to

---

[5] Pa. Stat., Tit. 62, § 432 (6) (1968). See also Pa. Pub. Assistance Manual §§ 3150–3151 (1962). Section 432 (6) provides:

"Assistance may be granted only to or in behalf of a person residing in Pennsylvania who (i) has resided therein for at least one year immediately preceding the date of application; (ii) last resided in a state which, by law, regulation or reciprocal agreement with Pennsylvania, grants public assistance to or in behalf of a person who has resided in such state for less than one year; (iii) is a married woman residing with a husband who meets the requirement prescribed in subclause (i) or (ii) of this clause; or (iv) is a child less than one year of age whose parent, or relative with whom he is residing, meets the requirement prescribed in subclause (i), (ii) or (iii) of this clause or resided in Pennsylvania for at least one year immediately preceding the child's birth. Needy persons who do not meet any of the requirements stated in this clause and who are transients or without residence in any state, may be granted assistance in accordance with rules, regulations, and standards established by the department."

effect their prompt departure after they have gotten there," it would be "patently improper and its implementation plainly impermissible." *Id.*, at 67–68. We noted probable jurisdiction. 390 U. S. 940 (1968).

## II.

There is no dispute that the effect of the waiting-period requirement in each case is to create two classes of needy resident families indistinguishable from each other except that one is composed of residents who have resided a year or more, and the second of residents who have resided less than a year, in the jurisdiction. On the basis of this sole difference the first class is granted and the second class is denied welfare aid upon which may depend the ability of the families to obtain the very means to subsist—food, shelter, and other necessities of life. In each case, the District Court found that appellees met the test for residence in their jurisdictions, as well as all other eligibility requirements except the requirement of residence for a full year prior to their applications. On reargument, appellees' central contention is that the statutory prohibition of benefits to residents of less than a year creates a classification which constitutes an invidious discrimination denying them equal protection of the laws.[6] We agree. The interests which appellants assert are promoted by the classification either may not constitutionally be promoted by government or are not compelling governmental interests.

## III.

Primarily, appellants justify the waiting-period requirement as a protective device to preserve the fiscal integrity of state public assistance programs. It is asserted that people who require welfare assistance during their first

---

[6] This constitutional challenge cannot be answered by the argument that public assistance benefits are a "privilege" and not a "right." See *Sherbert* v. *Verner*, 374 U. S. 398, 404 (1963).

year of residence in a State are likely to become continuing burdens on state welfare programs. Therefore, the argument runs, if such people can be deterred from entering the jurisdiction by denying them welfare benefits during the first year, state programs to assist long-time residents will not be impaired by a substantial influx of indigent newcomers.[7]

There is weighty evidence that exclusion from the jurisdiction of the poor who need or may need relief was the specific objective of these provisions. In the Congress, sponsors of federal legislation to eliminate all residence requirements have been consistently opposed by representatives of state and local welfare agencies who have stressed the fears of the States that elimination of the requirements would result in a heavy influx of individuals into States providing the most generous benefits. See, *e. g.,* Hearings on H. R. 10032 before the House Committee on Ways and Means, 87th Cong., 2d Sess., 309–310, 644 (1962); Hearings on H. R. 6000 before the Senate Committee on Finance, 81st Cong.,

---

[7] The waiting-period requirement has its antecedents in laws prevalent in England and the American Colonies centuries ago which permitted the ejection of individuals and families if local authorities thought they might become public charges. For example, the preamble of the English Law of Settlement and Removal of 1662 expressly recited the concern, also said to justify the three statutes before us, that large numbers of the poor were moving to parishes where more liberal relief policies were in effect. See generally Coll, Perspectives in Public Welfare: The English Heritage, 4 Welfare in Review, No. 3, p. 1 (1966). The 1662 law and the earlier Elizabethan Poor Law of 1601 were the models adopted by the American Colonies. Newcomers to a city, town, or county who might become public charges were "warned out" or "passed on" to the next locality. Initially, the funds for welfare payments were raised by local taxes, and the controversy as to responsibility for particular indigents was between localities in the same State. As States—first alone and then with federal grants—assumed the major responsibility, the contest of nonresponsibility became interstate.

2d Sess., 324–327 (1950). The sponsor of the Connecticut requirement said in its support: "I doubt that Connecticut can and should continue to allow unlimited migration into the state on the basis of offering instant money and permanent income to all who can make their way to the state regardless of their ability to contribute to the economy." H. B. 82, Connecticut General Assembly House Proceedings, February Special Session, 1965, Vol. II, pt. 7, p. 3504. In Pennsylvania, shortly after the enactment of the one-year requirement, the Attorney General issued an opinion construing the one-year requirement strictly because "[a]ny other conclusion would tend to attract the dependents of other states to our Commonwealth." 1937–1938 Official Opinions of the Attorney General, No. 240, p. 110. In the District of Columbia case, the constitutionality of § 3–203 was frankly defended in the District Court and in this Court on the ground that it is designed to protect the jurisdiction from an influx of persons seeking more generous public assistance than might be available elsewhere.

We do not doubt that the one-year waiting-period device is well suited to discourage the influx of poor families in need of assistance. An indigent who desires to migrate, resettle, find a new job, and start a new life will doubtless hesitate if he knows that he must risk making the move without the possibility of falling back on state welfare assistance during his first year of residence, when his need may be most acute. But the purpose of inhibiting migration by needy persons into the State is constitutionally impermissible.

This Court long ago recognized that the nature of our Federal Union and our constitutional concepts of personal liberty unite to require that all citizens be free to travel throughout the length and breadth of our land uninhibited by statutes, rules, or regulations which unreasonably burden or restrict this movement. That

proposition was early stated by Chief Justice Taney in the *Passenger Cases,* 7 How. 283, 492 (1849):

> "For all the great purposes for which the Federal government was formed, we are one people, with one common country. We are all citizens of the United States; and, as members of the same community, must have the right to pass and repass through every part of it without interruption, as freely as in our own States."

We have no occasion to ascribe the source of this right to travel interstate to a particular constitutional provision.[8] It suffices that, as MR. JUSTICE STEWART said for the Court in *United States* v. *Guest,* 383 U. S. 745, 757–758 (1966):

> "The constitutional right to travel from one State to another . . . occupies a position fundamental to the concept of our Federal Union. It is a right that has been firmly established and repeatedly recognized.
>
> ". . . [T]he right finds no explicit mention in the Constitution. The reason, it has been suggested, is

---

[8] In *Corfield* v. *Coryell,* 6 F. Cas. 546, 552 (No. 3230) (C. C. E. D. Pa. 1825), *Paul* v. *Virginia,* 8 Wall. 168, 180 (1869), and *Ward* v. *Maryland,* 12 Wall. 418, 430 (1871), the right to travel interstate was grounded upon the Privileges and Immunities Clause of Art. IV, § 2. See also *Slaughter-House Cases,* 16 Wall. 36, 79 (1873); *Twining* v. *New Jersey,* 211 U. S. 78, 97 (1908). In *Edwards* v. *California,* 314 U. S. 160, 181, 183–185 (1941) (DOUGLAS and Jackson, JJ., concurring), and *Twining* v. *New Jersey, supra,* reliance was placed on the Privileges and Immunities Clause of the Fourteenth Amendment. See also *Crandall* v. *Nevada,* 6 Wall. 35 (1868). In *Edwards* v. *California, supra,* and the *Passenger Cases,* 7 How. 283 (1849), a Commerce Clause approach was employed.

See also *Kent* v. *Dulles,* 357 U. S. 116, 125 (1958); *Aptheker* v. *Secretary of State,* 378 U. S. 500, 505–506 (1964); *Zemel* v. *Rusk,* 381 U. S. 1, 14 (1965), where the freedom of Americans to travel outside the country was grounded upon the Due Process Clause of the Fifth Amendment.

that a right so elementary was conceived from the beginning to be a necessary concomitant of the stronger Union the Constitution created. In any event, freedom to travel throughout the United States has long been recognized as a basic right under the Constitution."

Thus, the purpose of deterring the in-migration of indigents cannot serve as justification for the classification created by the one-year waiting period, since that purpose is constitutionally impermissible. If a law has "no other purpose . . . than to chill the assertion of constitutional rights by penalizing those who choose to exercise them, then it [is] patently unconstitutional." *United States* v. *Jackson,* 390 U. S. 570, 581 (1968).

Alternatively, appellants argue that even if it is impermissible for a State to attempt to deter the entry of all indigents, the challenged classification may be justified as a permissible state attempt to discourage those indigents who would enter the State solely to obtain larger benefits. We observe first that none of the statutes before us is tailored to serve that objective. Rather, the class of barred newcomers is all-inclusive, lumping the great majority who come to the State for other purposes with those who come for the sole purpose of collecting higher benefits. In actual operation, therefore, the three statutes enact what in effect are nonrebuttable presumptions that every applicant for assistance in his first year of residence came to the jurisdiction solely to obtain higher benefits. Nothing whatever in any of these records supplies any basis in fact for such a presumption.

More fundamentally, a State may no more try to fence out those indigents who seek higher welfare benefits than it may try to fence out indigents generally. Implicit in any such distinction is the notion that indigents who enter a State with the hope of securing higher welfare benefits are somehow less deserving than indigents who do not

take this consideration into account. But we do not perceive why a mother who is seeking to make a new life for herself and her children should be regarded as less deserving because she considers, among others factors, the level of a State's public assistance. Surely such a mother is no less deserving than a mother who moves into a particular State in order to take advantage of its better educational facilities.

Appellants argue further that the challenged classification may be sustained as an attempt to distinguish between new and old residents on the basis of the contribution they have made to the community through the payment of taxes. We have difficulty seeing how long-term residents who qualify for welfare are making a greater present contribution to the State in taxes than indigent residents who have recently arrived. If the argument is based on contributions made in the past by the long-term residents, there is some question, as a factual matter, whether this argument is applicable in Pennsylvania where the record suggests that some 40% of those denied public assistance because of the waiting period had lengthy prior residence in the State.[9] But we need not rest on the particular facts of these cases. Appellants' reasoning would logically permit the State to bar new residents from schools, parks, and libraries or deprive them of police and fire protection. Indeed it would permit the State to apportion all benefits and services according to the past tax contributions of its

_____

[9] Furthermore, the contribution rationale can hardly explain why the District of Columbia and Pennsylvania bar payments to children who have not lived in the jurisdiction for a year regardless of whether the parents have lived in the jurisdiction for that period. See D. C. Code § 3–203; D. C. Handbook, EL 9.1, I (C) (1966); Pa. Stat., Tit. 62, § 432 (6) (1968). Clearly, the children who were barred would not have made a contribution during that year.

citizens. The Equal Protection Clause prohibits such an apportionment of state services.[10]

We recognize that a State has a valid interest in preserving the fiscal integrity of its programs. It may legitimately attempt to limit its expenditures, whether for public assistance, public education, or any other program. But a State may not accomplish such a purpose by invidious distinctions between classes of its citizens. It could not, for example, reduce expenditures for education by barring indigent children from its schools. Similarly, in the cases before us, appellants must do more than show that denying welfare benefits to new residents saves money. The saving of welfare costs cannot justify an otherwise invidious classification.[11]

In sum, neither deterrence of indigents from migrating to the State nor limitation of welfare benefits to those regarded as contributing to the State is a constitutionally permissible state objective.

## IV.

Appellants next advance as justification certain administrative and related governmental objectives allegedly served by the waiting-period requirement.[12] They argue

---

[10] We are not dealing here with state insurance programs which may legitimately tie the amount of benefits to the individual's contributions.

[11] In *Rinaldi* v. *Yeager,* 384 U. S. 305 (1966), New Jersey attempted to reduce expenditures by requiring prisoners who took an unsuccessful appeal to reimburse the State out of their institutional earnings for the cost of furnishing a trial transcript. This Court held the New Jersey statute unconstitutional because it did not require similar repayments from unsuccessful appellants given a suspended sentence, placed on probation, or sentenced only to a fine. There was no rational basis for the distinction between unsuccessful appellants who were in prison and those who were not.

[12] Appellant in No. 9, the Connecticut Welfare Commissioner, disclaims any reliance on this contention. In No. 34, the District

that the requirement (1) facilitates the planning of the welfare budget; (2) provides an objective test of residency; (3) minimizes the opportunity for recipients fraudulently to receive payments from more than one jurisdiction; and (4) encourages early entry of new residents into the labor force.

At the outset, we reject appellants' argument that a mere showing of a rational relationship between the waiting period and these four admittedly permissible state objectives will suffice to justify the classification. See *Lindsley* v. *Natural Carbonic Gas Co.,* 220 U. S. 61, 78 (1911); *Flemming* v. *Nestor,* 363 U. S. 603, 611 (1960); *McGowan* v. *Maryland,* 366 U. S. 420, 426 (1961). The waiting-period provision denies welfare benefits to otherwise eligible applicants solely because they have recently moved into the jurisdiction. But in moving from State to State or to the District of Columbia appellees were exercising a constitutional right, and any classification which serves to penalize the exercise of that right, unless shown to be necessary to promote a *compelling* governmental interest, is unconstitutional. Cf. *Skinner* v. *Oklahoma,* 316 U. S. 535, 541 (1942); *Korematsu* v. *United States,* 323 U. S. 214, 216 (1944); *Bates* v. *Little Rock,* 361 U. S. 516, 524 (1960); *Sherbert* v. *Verner,* 374 U. S. 398, 406 (1963).

The argument that the waiting-period requirement facilitates budget predictability is wholly unfounded. The records in all three cases are utterly devoid of evidence that either State or the District of Columbia in fact uses the one-year requirement as a means to predict the number of people who will require assistance in the budget year. None of the appellants takes a census of new residents or collects any other data that would reveal the number of newcomers in the State less than a year.

Court found as a fact that the Pennsylvania requirement served none of the claimed functions. 277 F. Supp. 65, 68 (1967).

Nor are new residents required to give advance notice of their need for welfare assistance.[13] Thus, the welfare authorities cannot know how many new residents come into the jurisdiction in any year, much less how many of them will require public assistance. In these circumstances, there is simply no basis for the claim that the one-year waiting requirement serves the purpose of making the welfare budget more predictable. In Connecticut and Pennsylvania the irrelevance of the one-year requirement to budgetary planning is further underscored by the fact that temporary, partial assistance is given to some new residents[14] and full assistance is given to other new residents under reciprocal agreements.[15] Finally, the claim that a one-year waiting requirement is used for planning purposes is plainly belied by the fact that the requirement is not also imposed on applicants. who are long-term residents, the group that receives the bulk of welfare payments. In short, the States rely on methods other than the one-year requirement to make budget estimates. In No. 34, the Director of the Pennsylvania Bureau of Assistance Policies and Standards testified that, based on experience in Pennsylvania and elsewhere, her office had already estimated how much the elimination of the one-year requirement would cost and that the estimates of costs of other changes in regulations "have proven exceptionally accurate."

---

[13] Of course, such advance notice would inevitably be unreliable since some who registered would not need welfare a year later while others who did not register would need welfare.

[14] See Conn. Gen. Stat. Rev. § 17–2d, now § 17–2c, and Pa. Pub. Assistance Manual § 3154 (1968).

[15] Both Connecticut and Pennsylvania have entered into open-ended interstate compacts in which they have agreed to eliminate the durational requirement for anyone who comes from another State which has also entered into the compact. Conn. Gen. Stat. Rev. § 17–21a (1968); Pa. Pub. Assistance Manual § 3150, App. I (1966).

The argument that the waiting period serves as an administratively efficient rule of thumb for determining residency similarly will not withstand scrutiny. The residence requirement and the one-year waiting-period requirement are distinct and independent prerequisites for assistance under these three statutes, and the facts relevant to the determination of each are directly examined by the welfare authorities.[16] Before granting an application, the welfare authorities investigate the applicant's employment, housing, and family situation and in the course of the inquiry necessarily learn the facts upon which to determine whether the applicant is a resident.[17]

[16] In Pennsylvania, the one-year waiting-period requirement, but not the residency requirement, is waived under reciprocal agreements. Pa. Stat., Tit. 62, § 432 (6) (1968); Pa. Pub. Assistance Manual § 3151.21 (1962).

1 Conn. Welfare Manual, c. II, § 220 (1966), provides that "[r]esidence within the state shall mean that the applicant is living in an established place of abode and the plan is to remain." A person who meets this requirement does not have to wait a year for assistance if he entered the State with a bona fide job offer or with sufficient funds to support himself without welfare for three months. *Id.*, at § 219.2.

HEW Handbook of Pub. Assistance Administration, pt. IV, § 3650 (1946), clearly distinguishes between residence and duration of residence. It defines residence, as is conventional, in terms of intent to remain in the jurisdiction, and it instructs interviewers that residence and length of residence "are two distinct aspects . . . ."

[17] See, *e. g.*, D. C. Handbook, chapters on Eligibility Payments, Requirements, Resources, and Reinvestigation for an indication of how thorough these investigations are. See also 1 Conn. Welfare Manual, c. I (1967); Pa. Pub. Assistance Manual §§ 3170–3330 (1962).

The Department of Health, Education, and Welfare has proposed the elimination of individual investigations, except for spot checks, and the substitution of a declaration system, under which the "agency accepts the statements of the applicant for or recipient of assistance, about facts that are within his knowledge and competence . . . as a basis for decisions regarding his eligibility and extent of entitlement." HEW, Determination of Eligibility for Public

Similarly, there is no need for a State to use the one-year waiting period as a safeguard against fraudulent receipt of benefits;[18] for less drastic means are available, and are employed, to minimize that hazard. Of course, a State has a valid interest in preventing fraud by any applicant, whether a newcomer or a long-time resident. It is not denied, however, that the investigations now conducted entail inquiries into facts relevant to that subject. In addition, cooperation among state welfare departments is common. The District of Columbia, for example, provides interim assistance to its former residents who have moved to a State which has a waiting period. As a matter of course, District officials send a letter to the welfare authorities in the recipient's new community "to request the information needed to continue assistance."[19] A like procedure would be an effective safeguard against the hazard of double payments. Since double payments can be prevented by a letter or a telephone call, it is unreasonable to accomplish this objective by the blunderbuss method of denying assistance to all indigent newcomers for an entire year.

Pennsylvania suggests that the one-year waiting period is justified as a means of encouraging new residents to join the labor force promptly. But this logic would also require a similar waiting period for long-term residents of the State. A state purpose to encourage employment

Assistance Programs, 33 Fed. Reg. 17189 (1968). See also Hoshino, Simplification of the Means Test and its Consequences, 41 Soc. Serv. Rev. 237, 241–249 (1967); Burns, What's Wrong With Public Welfare?, 36 Soc. Serv. Rev. 111, 114–115 (1962). Presumably the statement of an applicant that he intends to remain in the jurisdiction would be accepted under a declaration system.

[18] The unconcern of Connecticut and Pennsylvania with the one-year requirement as a means of preventing fraud is made apparent by the waiver of the requirement in reciprocal agreements with other States. See n. 15, *supra.*

[19] D. C. Handbook, RV 2.1, I, II (B) (1967). See also Pa. Pub. Assistance Manual § 3153 (1962).

provides no rational basis for imposing a one-year waiting-period restriction on new residents only.

We conclude therefore that appellants in these cases do not use and have no need to use the one-year requirement for the governmental purposes suggested. Thus, even under traditional equal protection tests a classification of welfare applicants according to whether they have lived in the State for one year would seem irrational and unconstitutional.[20] But, of course, the traditional criteria do not apply in these cases. Since the classification here touches on the fundamental right of interstate movement, its constitutionality must be judged by the stricter standard of whether it promotes a *compelling* state interest. Under this standard, the waiting-period requirement clearly violates the Equal Protection Clause.[21]

## V.

Connecticut and Pennsylvania argue, however, that the constitutional challenge to the waiting-period requirements must fail because Congress expressly approved the imposition of the requirement by the States as part of the jointly funded AFDC program.

Section 402 (b) of the Social Security Act of 1935, as amended, 42 U. S. C. § 602 (b), provides that:

"The Secretary shall approve any [state assistance] plan which fulfills the conditions specified in sub-

[20] Under the traditional standard, equal protection is denied only if the classification is "without any reasonable basis," *Lindsley* v. *Natural Carbonic Gas Co.,* 220 U. S. 61, 78 (1911); see also *Flemming* v. *Nestor,* 363 U. S. 603 (1960).

[21] We imply no view of the validity of waiting-period *or* residence requirements determining eligibility to vote, eligibility for tuition-free education, to obtain a license to practice a profession, to hunt or fish, and so forth. Such requirements may promote compelling state interests on the one hand, or, on the other, may not be penalties upon the exercise of the constitutional right of interstate travel.

section (a) of this section, except that he shall not approve any plan which imposes as a condition of eligibility for aid to families with dependent children, a residence requirement which denies aid with respect to any child residing in the State (1) who has resided in the State for one year immediately preceding the application for such aid, or (2) who was born within one year immediately preceding the application, if the parent or other relative with whom the child is living has resided in the State for one year immediately preceding the birth."

On its face, the statute does not approve, much less prescribe, a one-year requirement. It merely directs the Secretary of Health, Education, and Welfare not to disapprove plans submitted by the States because they include such a requirement.[22] The suggestion that Congress enacted that directive to encourage state participation in the AFDC program is completely refuted by the legislative history of the section. That history discloses that Congress enacted the directive to curb hardships resulting from lengthy residence requirements. Rather than constituting an approval or a prescription of the requirement in state plans, the directive was the means chosen by Congress to deny federal funding to any State which persisted in stipulating excessive residence requirements as a condition of the payment of benefits.

One year before the Social Security Act was passed, 20 of the 45 States which had aid to dependent children programs required residence in the State for two or more years. Nine other States required two or more years of

---

[22] As of 1964, 11 jurisdictions imposed no residence requirement whatever for AFDC assistance. They were Alaska, Georgia, Hawaii, Kentucky, New Jersey, New York, Rhode Island, Vermont, Guam, Puerto Rico, and the Virgin Islands. See HEW, Characteristics of State Public Assistance Plans under the Social Security Act (Pub. Assistance Rep. No. 50, 1964 ed.).

residence in a particular town or county. And 33 jurisdictions required at least one year of residence in a particular town or county.[23] Congress determined to combat this restrictionist policy. Both the House and Senate Committee Reports expressly stated that the objective of § 402 (b) was to compel "[l]iberality of residence requirement." [24] Not a single instance can be found in the debates or committee reports supporting the contention that § 402 (b) was enacted to encourage participation by the States in the AFDC program. To the contrary, those few who addressed themselves to waiting-period requirements emphasized that participation would depend on a State's repeal or drastic revision of existing requirements. A congressional demand on 41 States to repeal or drastically revise offending statutes is hardly a way to enlist their cooperation.[25]

---

[23] Social Security Board, Social Security in America 235–236 (1937).

[24] H. R. Rep. No. 615, 74th Cong., 1st Sess., 24; S. Rep. No. 628, 74th Cong., 1st Sess., 35. Furthermore, the House Report cited President Roosevelt's statement in his Social Security Message that "People want decent homes to live in; they want to locate them where they can engage in productive work . . . ." H. R. Rep., *supra*, at 2. Clearly this was a call for greater freedom of movement.

In addition to the statement in the above Committee report, see the remarks of Rep. Doughton (floor manager of the Social Security bill in the House) and Rep. Vinson. 79 Cong. Rec. 5474, 5602–5603 (1935). These remarks were made in relation to the waiting-period requirements for old-age assistance, but they apply equally to the AFDC program.

[25] Section 402 (b) required the repeal of 30 state statutes which imposed too long a waiting period in the State or particular town or county and 11 state statutes (as well as the Hawaii statute) which required residence in a particular town or county. See Social Security Board, Social Security in America 235–236 (1937).

It is apparent that Congress was not intimating any view of the constitutionality of a one-year limitation. The constitutionality of any scheme of federal social security legislation was a matter of

But even if we were to assume, *arguendo,* that Congress did approve the imposition of a one-year waiting period, it is the responsive *state* legislation which infringes constitutional rights. By itself § 402 (b) has absolutely no restrictive effect. It is therefore not that statute but only the state requirements which pose the constitutional question.

Finally, even if it could be argued that the constitutionality of § 402 (b) is somehow at issue here, it follows from what we have said that the provision, insofar as it permits the one-year waiting-period requirement, would be unconstitutional. Congress may not authorize the States to violate the Equal Protection Clause. Perhaps Congress could induce wider state participation in school construction if it authorized the use of joint funds for the building of segregated schools. But could it seriously be contended that Congress would be constitutionally justified in such authorization by the need to secure state cooperation? Congress is without power to enlist state cooperation in a joint federal-state program by legislation which authorizes the States to violate the Equal Protection Clause. *Katzenbach* v. *Morgan,* 384 U. S. 641, 651, n. 10 (1966).

## VI.

The waiting-period requirement in the District of Columbia Code involved in No. 33 is also unconstitutional even though it was adopted by Congress as an exercise of federal power. In terms of federal power, the discrimination created by the one-year requirement violates the Due

doubt at that time in light of the decision in *Schechter Poultry Corp.* v. *United States,* 295 U. S. 495 (1935). Throughout the House debates congressmen discussed the constitutionality of the fundamental taxing provisions of the Social Security Act, see, *e. g.,* 79 Cong. Rec. 5783 (1935) (remarks of Rep. Cooper), but not once did they discuss the constitutionality of § 402 (b).

Process Clause of the Fifth Amendment. "[W]hile the Fifth Amendment contains no equal protection clause, it does forbid discrimination that is 'so unjustifiable as to be violative of due process.'" *Schneider* v. *Rusk,* 377 U. S. 163, 168 (1964); *Bolling* v. *Sharpe,* 347 U. S. 497 (1954). For the reasons we have stated in invalidating the Pennsylvania and Connecticut provisions, the District of Columbia provision is also invalid—the Due Process Clause of the Fifth Amendment prohibits Congress from denying public assistance to poor persons otherwise eligible solely on the ground that they have not been residents of the District of Columbia for one year at the time their applications are filed.

Accordingly, the judgments in Nos. 9, 33, and 34 are

*Affirmed.*

MR. JUSTICE STEWART, concurring.

In joining the opinion of the Court, I add a word in response to the dissent of my Brother HARLAN, who, I think, has quite misapprehended what the Court's opinion says.

The Court today does *not* "pick out particular human activities, characterize them as 'fundamental,' and give them added protection . . . ." To the contrary, the Court simply recognizes, as it must, an established constitutional right, and gives to that right no less protection than the Constitution itself demands.

"The constitutional right to travel from one State to another . . . has been firmly established and repeatedly recognized." *United States* v. *Guest,* 383 U. S. 745, 757. This constitutional right, which, of course, includes the right of "entering and abiding in any State in the Union," *Truax* v. *Raich,* 239 U. S. 33, 39, is *not* a mere conditional liberty subject to regulation and control under conven-

tional due process or equal protection standards.[1] "[T]he right to travel freely from State to State finds constitutional protection that is quite independent of the Fourteenth Amendment." *United States* v. *Guest, supra,* at 760, n. 17.[2] As we made clear in *Guest,* it is a right broadly assertable against private interference as well as governmental action.[3] Like the right of association, *NAACP* v. *Alabama,* 357 U. S. 449, it is a virtually unconditional personal right,[4] guaranteed by the Constitution to us all.

It follows, as the Court says, that "the purpose of deterring the in-migration of indigents cannot serve as justification for the classification created by the one-year waiting period, since that purpose is constitutionally impermissible." And it further follows, as the Court says, that any *other* purposes offered in support of a

---

[1] By contrast, the "right" of international travel has been considered to be no more than an aspect of the "liberty" protected by the Due Process Clause of the Fifth Amendment. *Kent* v. *Dulles,* 357 U. S. 116, 125; *Aptheker* v. *Secretary of State,* 378 U. S. 500, 505–506. As such, this "right," the Court has held, can be regulated within the bounds of due process. *Zemel* v. *Rusk,* 381 U. S. 1.

[2] The constitutional right of interstate travel was fully recognized long before adoption of the Fourteenth Amendment. See the statement of Chief Justice Taney in the *Passenger Cases,* 7 How. 283, 492:

"For all the great purposes for which the Federal government was formed, we are one people, with one common country. We are all citizens of the United States; and, as members of the same community, must have the right to pass and repass through every part of it without interruption, as freely as in our own States."

[3] Mr. Justice Harlan was alone in dissenting from this square holding in *Guest. Supra,* at 762.

[4] The extent of emergency governmental power temporarily to prevent or control interstate travel, *e. g.,* to a disaster area, need not be considered in these cases.

law that so clearly impinges upon the constitutional right of interstate travel must be shown to reflect a *compelling* governmental interest. This is necessarily true whether the impinging law be a classification statute to be tested against the Equal Protection Clause, or a state or federal regulatory law, to be tested against the Due Process Clause of the Fourteenth or Fifth Amendment. As MR. JUSTICE HARLAN wrote for the Court more than a decade ago, "[T]o justify the deterrent effect . . . on the free exercise . . . of their constitutionally protected right . . . a '. . . subordinating interest of the State must be compelling.'" *NAACP* v. *Alabama, supra,* at 463.

The Court today, therefore, is not "contriving new constitutional principles." It is deciding these cases under the aegis of established constitutional law.[5]

MR. CHIEF JUSTICE WARREN, with whom MR. JUSTICE BLACK joins, dissenting.

In my opinion the issue before us can be simply stated: May Congress, acting under one of its enumerated powers, impose minimal nationwide residence requirements or authorize the States to do so? Since I believe that Congress does have this power and has constitutionally exercised it in these cases, I must dissent.

I.

The Court insists that § 402 (b) of the Social Security Act "does not approve, much less prescribe, a one-year requirement." *Ante,* at 639. From its reading of the legislative history it concludes that Congress did not intend to authorize the States to impose residence re-

---

[5] It is to be remembered that the Court today *affirms* the judgments of three different federal district courts, and that at least four other federal courts have reached the same result. See *ante,* at 622, n. 1.

quirements. An examination of the relevant legislative materials compels, in my view, the opposite conclusion, *i. e.,* Congress intended to authorize state residence requirements of up to one year.

The Great Depression of the 1930's exposed the inadequacies of state and local welfare programs and dramatized the need for federal participation in welfare assistance. See J. Brown, Public Relief 1929–1939 (1940). Congress determined that the Social Security Act, containing a system of unemployment and old-age insurance as well as the categorical assistance programs now at issue, was to be a major step designed to ameliorate the problems of economic insecurity. The primary purpose of the categorical assistance programs was to encourage the States to provide new and greatly enhanced welfare programs. See, *e. g.,* S. Rep. No. 628, 74th Cong., 1st Sess., 5–6, 18–19 (1935); H. R. Rep. No. 615, 74th Cong., 1st Sess., 4 (1935). Federal aid would mean an immediate increase in the amount of benefits paid under state programs. But federal aid was to be conditioned upon certain requirements so that the States would remain the basic administrative units of the welfare system and would be unable to shift the welfare burden to local governmental units with inadequate financial resources. See Advisory Commission on Intergovernmental Relations, Statutory and Administrative Controls Associated with Federal Grants for Public Assistance 9–26 (1964). Significantly, the categories of assistance programs created by the Social Security Act corresponded to those already in existence in a number of States. See J. Brown, Public Relief 1929–1939, at 26–32. Federal entry into the welfare area can therefore be best described as a major experiment in "cooperative federalism," *King* v. *Smith,* 392 U. S. 309, 317 (1968), combining state and federal participation to solve the problems of the depression.

Each of the categorical assistance programs contained in the Social Security Act allowed participating States to impose residence requirements as a condition of eligibility for benefits. Congress also imposed a one-year requirement for the categorical assistance programs operative in the District of Columbia. See H. R. Rep. No. 891, 74th Cong., 1st Sess. (1935) (old-age pensions); H. R. Rep. No. 201, 74th Cong., 1st Sess. (1935) (aid to the blind). The congressional decision to allow the States to impose residence requirements and to enact such a requirement for the District was the subject of considerable discussion. Both those favoring lengthy residence requirements [1] and those opposing all requirements [2] pleaded their case during the congressional hearings on the Social Security Act. Faced with the competing claims of States which feared that abolition of residence requirements would result in an influx of persons seeking higher welfare payments and of organizations which stressed the unfairness of such requirements to transient workers forced by the economic dislocation of the depression to seek work far from their homes, Congress chose a middle course. It required those States seeking federal grants for categorical assistance to reduce their existing residence requirements to what Congress viewed as an acceptable maximum. However, Congress accommodated state fears by allowing the States to retain minimal residence requirements.

Congress quickly saw evidence that the system of welfare assistance contained in the Social Security Act including residence requirements was operating to encourage States to expand and improve their categorical

---

[1] See, e. g., Hearings on H. R. 4120 before the House Committee on Ways and Means, 74th Cong., 1st Sess., 831–832, 861–871 (1935).

[2] See, e. g., Hearings on S. 1130 before the Senate Committee on Finance, 74th Cong., 1st Sess., 522–540, 643, 656 (1935).

assistance programs. For example, the Senate was told in 1939:

> "The rapid expansion of the program for aid to dependent children in the country as a whole since 1935 stands in marked contrast to the relatively stable picture of mothers' aid in the preceding 4-year period from 1932 through 1935. The extension of the program during the last 3 years is due to Federal contributions which encouraged the matching of State and local funds." S. Rep. No. 734, 76th Cong., 1st Sess., 29 (1939).

The trend observed in 1939 continued as the States responded to the federal stimulus for improvement in the scope and amount of categorical assistance programs. See Wedemeyer & Moore, The American Welfare System, 54 Calif. L. Rev. 326, 347–356 (1966). Residence requirements have remained a part of this combined state-federal welfare program for 34 years. Congress has adhered to its original decision that residence requirements were necessary in the face of repeated attacks against these requirements.[3] The decision to retain residence requirements, combined with Congress' continuing desire to encourage wider state participation in categorical assistance programs, indicates to me that Congress has authorized the imposition by the States of residence requirements.

II.

Congress has imposed a residence requirement in the District of Columbia and authorized the States to impose similar requirements. The issue before us must therefore be framed in terms of whether Congress may

---

[3] See e. g., Hearings on H. R. 10032 before the House Committee on Ways and Means, 87th Cong., 2d Sess., 355, 385–405, 437 (1962); Hearings on H. R. 6000 before the Senate Committee on Finance, 81st Cong., 2d Sess., 142–143 (1950).

648

create minimal residence requirements, not whether the States, acting alone, may do so. See *Prudential Insurance Co.* v. *Benjamin,* 328 U. S. 408 (1946); *In re Rahrer,* 140 U. S. 545 (1891). Appellees insist that a congressionally mandated residence requirement would violate their right to travel. The import of their contention is that Congress, even under its "plenary" [4] power to control interstate commerce, is constitutionally prohibited from imposing residence requirements. I reach a contrary conclusion for I am convinced that the extent of the burden on interstate travel when compared with the justification for its imposition requires the Court to uphold this exertion of federal power.

Congress, pursuant to its commerce power, has enacted a variety of restrictions upon interstate travel. It has taxed air and rail fares and the gasoline needed to power cars and trucks which move interstate. 26 U. S. C. § 4261 (air fares); 26 U. S. C. § 3469 (1952 ed.), repealed in part by Pub. L. 87–508, § 5 (b), 76 Stat. 115 (rail fares); 26 U. S. C. § 4081 (gasoline). Many of the federal safety regulations of common carriers which cross state lines burden the right to travel. 45 U. S. C. §§ 1–43 (railroad safety appliances); 49 U. S. C. § 1421 (air safety regulations). And Congress has prohibited by criminal statute interstate travel for certain purposes. *E. g.,* 18 U. S. C. § 1952. Although these restrictions operate as a limitation upon free interstate movement of persons, their constitutionality appears well settled. See *Texas & Pacific R. Co.* v. *Rigsby,* 241 U. S. 33, 41 (1916); *Southern R. Co.* v. *United States,* 222 U. S. 20 (1911); *United States* v. *Zizzo,* 338 F. 2d 577 (C. A. 7th Cir., 1964), cert. denied, 381 U. S. 915 (1965). As the Court observed in *Zemel* v. *Rusk,* 381 U. S. 1, 14 (1965), "the fact that a liberty cannot be inhibited without due

[4] See *e. g., Heart of Atlanta Motel, Inc.* v. *United States,* 379 U. S. 241, 256–260 (1964).

process of law does not mean that it can under no circumstances be inhibited."

The Court's right-to-travel cases lend little support to the view that congressional action is invalid merely because it burdens the right to travel. Most of our cases fall into two categories: those in which *state*-imposed restrictions were involved, see, *e. g., Edwards* v. *California,* 314 U. S. 160 (1941); *Crandall* v. *Nevada,* 6 Wall. 35 (1868), and those concerning congressional decisions to remove impediments to interstate movement, see, *e. g., United States* v. *Guest,* 383 U. S. 745 (1966). Since the focus of our inquiry must be whether Congress would exceed permissible bounds by imposing residence requirements, neither group of cases offers controlling principles.

In only three cases have we been confronted with an assertion that Congress has impermissibly burdened the right to travel. *Kent* v. *Dulles,* 357 U. S. 116 (1958), did invalidate a burden on the right to travel; however, the restriction was voided on the nonconstitutional basis that Congress did not intend to give the Secretary of State power to create the restriction at issue. *Zemel* v. *Rusk, supra,* on the other hand, sustained a flat prohibition of travel to certain designated areas and rejected an attack that Congress could not constitutionally impose this restriction. *Aptheker* v. *Secretary of State,* 378 U. S. 500 (1964), is the only case in which this Court invalidated on a constitutional basis a congressionally imposed restriction. *Aptheker* also involved a flat prohibition but in combination with a claim that the congressional restriction compelled a potential traveler to choose between his right to travel and his First Amendment right of freedom of association. It was this Hobson's choice, we later explained, which forms the rationale of *Aptheker.* See *Zemel* v. *Rusk, supra,* at 16. *Aptheker* thus contains two characteristics distinguishing it from the appeals now before the Court: a combined

infringement of two constitutionally protected rights and a flat prohibition upon travel. Residence requirements do not create a flat prohibition, for potential welfare recipients may move from State to State and establish residence wherever they please. Nor is any claim made by appellees that residence requirements compel them to choose between the right to travel and another constitutional right.

*Zemel* v. *Rusk,* the most recent of the three cases, provides a framework for analysis. The core inquiry is "the extent of the governmental restriction imposed" and the "extent of the necessity for the restriction." *Id.,* at 14. As already noted, travel itself is not prohibited. Any burden inheres solely in the fact that a potential welfare recipient might take into consideration the loss of welfare benefits for a limited period of time if he changes his residence. Not only is this burden of uncertain degree,[5] but appellees themselves assert there is evidence that few welfare recipients have in fact been deterred by residence requirements. See Harvith, The Constitutionality of Residence Tests for General and Categorical Assistance Programs, 54 Calif. L. Rev. 567, 615–618 (1966); Note, Residence Requirements in State Public Welfare Statutes, 51 Iowa L. Rev. 1080, 1083–1085 (1966).

The insubstantiality of the restriction imposed by residence requirements must then be evaluated in light of the possible congressional reasons for such requirements. See, *e. g., McGowan* v. *Maryland,* 366 U. S. 420, 425–427 (1961). One fact which does emerge with clarity from the legislative history is Congress' belief that a program of cooperative federalism combining federal aid with

---

[5] The burden is uncertain because indigents who are disqualified from categorical assistance by residence requirements are not left wholly without assistance. All of the appellees in these cases found alternative sources of assistance after their disqualification.

enhanced state participation would result in an increase in the scope of welfare programs and level of benefits. Given the apprehensions of many States that an increase in benefits without minimal residence requirements would result in an inability to provide an adequate welfare system, Congress deliberately adopted the intermediate course of a cooperative program. Such a program, Congress believed, would encourage the States to assume greater welfare responsibilities and would give the States the necessary financial support for such an undertaking. Our cases require only that Congress have a rational basis for finding that a chosen regulatory scheme is necessary to the furtherance of interstate commerce. See, *e. g., Katzenbach* v. *McClung,* 379 U. S. 294 (1964); *Wickard* v. *Filburn,* 317 U. S. 111 (1942). Certainly, a congressional finding that residence requirements allowed each State to concentrate its resources upon new and increased programs of rehabilitation ultimately resulting in an enhanced flow of commerce as the economic condition of welfare recipients progressively improved is rational and would justify imposition of residence requirements under the Commerce Clause. And Congress could have also determined that residence requirements fostered personal mobility. An individual no longer dependent upon welfare would be presented with an unfettered range of choices so that a decision to migrate could be made without regard to considerations of possible economic dislocation.

Appellees suggest, however, that Congress was not motivated by rational considerations. Residence requirements are imposed, they insist, for the illegitimate purpose of keeping poor people from migrating. Not only does the legislative history point to an opposite conclusion, but it also must be noted that "[i]nto the motives which induced members of Congress to [act] . . . this Court may not enquire." *Arizona* v. *California,* 283 U. S. 423, 455 (1931). We do not at-

652

tribute an impermissible purpose to Congress if the result would be to strike down an otherwise valid statute. *United States* v. *O'Brien,* 391 U. S. 367, 383 (1968); *McCray* v. *United States,* 195 U. S. 27, 56 (1904). Since the congressional decision is rational and the restriction on travel insubstantial, I conclude that residence requirements can be imposed by Congress as an exercise of its power to control interstate commerce consistent with the constitutionally guaranteed right to travel.

Without an attempt to determine whether any of Congress' enumerated powers would sustain residence requirements, the Court holds that congressionally imposed requirements violate the Due Process Clause of the Fifth Amendment. It thus suggests that, even if residence requirements would be a permissible exercise of the commerce power, they are "so unjustifiable as to be violative of due process." *Ante,* at 642. While the reasons for this conclusion are not fully explained, the Court apparently believes that, in the words of *Bolling* v. *Sharpe,* 347 U. S. 497, 500 (1954), residence requirements constitute "an arbitrary deprivation" of liberty.

If this is the import of the Court's opinion, then it seems to have departed from our precedents. We have long held that there is no requirement of uniformity when Congress acts pursuant to its commerce power. *Sunshine Anthracite Coal Co.* v. *Adkins,* 310 U. S. 381, 401 (1940); *Currin* v. *Wallace,* 306 U. S. 1, 13–14 (1939).[6] I do not suggest that Congress is completely free when legislating under one of its enumerated powers to enact wholly arbitrary classifications, for *Bolling* v. *Sharpe, supra,* and *Schneider* v. *Rusk,* 377 U. S. 163 (1964),

[6] Some of the cases go so far as to intimate that at least in the area of taxation Congress is not inhibited by any problems of classification. See *Helvering* v. *Lerner Stores Corp.,* 314 U. S. 463, 468 (1941); *Steward Machine Co.* v. *Davis,* 301 U. S. 548, 584 (1937); *LaBelle Iron Works* v. *United States,* 256 U. S. 377, 392 (1921).

counsel otherwise. Neither of these cases, however, is authority for invalidation of congressionally imposed residence requirements. The classification in *Bolling* required racial segregation in the public schools of the District of Columbia and was thus based upon criteria which we subject to the most rigid scrutiny. *Loving* v. *Virginia,* 388 U. S. 1, 11 (1967). *Schneider* involved an attempt to distinguish between native-born and naturalized citizens solely for administrative convenience. By authorizing residence requirements Congress acted not to facilitate an administrative function but to further its conviction that an impediment to the commercial life of this Nation would be removed by a program of cooperative federalism combining federal contributions with enhanced state benefits. Congress, not the courts, is charged with determining the proper prescription for a national illness. I cannot say that Congress is powerless to decide that residence requirements would promote this permissible goal and therefore must conclude that such requirements cannot be termed arbitrary.

The Court, after interpreting the legislative history in such a manner that the constitutionality of § 402 (b) is not at issue, gratuitously adds that § 402 (b) is unconstitutional. This method of approaching constitutional questions is sharply in contrast with the Court's approach in *Street* v. *New York, ante,* at 585–590. While in *Street* the Court strains to avoid the crucial constitutional question, here it summarily treats the constitutionality of a major provision of the Social Security Act when, given the Court's interpretation of the legislative materials, that provision is not at issue. Assuming that the constitutionality of § 402 (b) is properly treated by the Court, the cryptic footnote in *Katzenbach* v. *Morgan,* 384 U. S. 641, 651–652, n. 10 (1966), does not support its conclusion. Footnote 10 indicates that Congress is without power to undercut the equal-protection guarantee of racial equality in the guise of implementing

654

the Fourteenth Amendment. I do not mean to suggest otherwise. However, I do not understand this footnote to operate as a limitation upon Congress' power to further the flow of interstate commerce by reasonable residence requirements. Although the Court dismisses § 402 (b) with the remark that Congress cannot authorize the States to violate equal protection, I believe that the dispositive issue is whether under its commerce power Congress can impose residence requirements.

Nor can I understand the Court's implication, *ante,* at 638, n. 21, that other state residence requirements such as those employed in determining eligibility to vote do not present constitutional questions. Despite the fact that in *Drueding* v. *Devlin,* 380 U. S. 125 (1965), we affirmed an appeal from a three-judge District Court after the District Court had rejected a constitutional challenge to Maryland's one-year residence requirement for presidential elections, the rationale employed by the Court in these appeals would seem to require the opposite conclusion. If a State would violate equal protection by denying welfare benefits to those who have recently moved interstate, then it would appear to follow that equal protection would also be denied by depriving those who have recently moved interstate of the fundamental right to vote. There is nothing in the opinion of the Court to explain this dichotomy. In any event, since the constitutionality of a state residence requirement as applied to a presidential election is raised in a case now pending, *Hall* v. *Beals,* No. 950, 1968 Term, I would await that case for a resolution of the validity of state voting residence requirements.

III.

The era is long past when this Court under the rubric of due process has reviewed the wisdom of a congressional decision that interstate commerce will be fostered by the enactment of certain regulations. Com-

pare *Adkins* v. *Children's Hospital*, 261 U. S. 525 (1923), with *United States* v. *Darby*, 312 U. S. 100 (1941). Speaking for the Court in *Helvering* v. *Davis*, 301 U. S. 619, 644 (1937), Mr. Justice Cardozo said of another section of the Social Security Act:

> "Whether wisdom or unwisdom resides in the scheme of benefits set forth . . . is not for us to say. The answer to such inquiries must come from Congress, not the courts. Our concern here, as often, is with power, not with wisdom."

I am convinced that Congress does have power to enact residence requirements of reasonable duration or to authorize the States to do so and that it has exercised this power.

The Court's decision reveals only the top of the iceberg. Lurking beneath are the multitude of situations in which States have imposed residence requirements including eligibility to vote, to engage in certain professions or occupations or to attend a state-supported university. Although the Court takes pains to avoid acknowledging the ramifications of its decision, its implications cannot be ignored. I dissent.

MR. JUSTICE HARLAN, dissenting.

The Court today holds unconstitutional Connecticut, Pennsylvania, and District of Columbia statutes which restrict certain kinds of welfare benefits to persons who have lived within the jurisdiction for at least one year immediately preceding their applications. The Court has accomplished this result by an expansion of the comparatively new constitutional doctrine that some state statutes will be deemed to deny equal protection of the laws unless justified by a "compelling" governmental interest, and by holding that the Fifth Amendment's Due Process Clause imposes a similar limitation on federal enactments. Having decided that the "compelling interest" principle

is applicable, the Court then finds that the governmental interests here asserted are either wholly impermissible or are not "compelling." For reasons which follow, I disagree both with the Court's result and with its reasoning.

## I.

These three cases present two separate but related questions for decision. The first, arising from the District of Columbia appeal, is whether Congress may condition the right to receive Aid to Families with Dependent Children (AFDC) and Aid to the Permanently and Totally Disabled in the District of Columbia upon the recipient's having resided in the District for the preceding year.[1] The second, presented in the Pennsylvania and Connecticut appeals, is whether a State may, with the approval of Congress, impose the same conditions with

---

[1] Of the District of Columbia appellees, all sought AFDC assistance except appellee Barley, who asked for Aid to the Permanently and Totally Disabled. In 42 U. S. C. § 602 (b), Congress has authorized "States" (including the District of Columbia, see 42 U. S. C. § 1301 (a) (1)) to require up to one year's immediately prior residence as a condition of eligibility for AFDC assistance. See n. 15, infra. In 42 U. S. C. §§ 1352 (b) (1) and 1382 (b) (2), Congress has permitted "States" to condition disability payments upon the applicant's having resided in the State for up to five of the preceding nine years. However, D. C. Code § 3–203 prescribes a one-year residence requirement for both types of assistance, so the question of the constitutionality of a longer required residence period is not before us.

Appellee Barley also challenged in the District Court the constitutionality of a District of Columbia regulation which provided that time spent in a District of Columbia institution as a public charge did not count as residence for purposes of welfare eligibility. The District Court held that the regulation must fall for the same reasons as the residence statute itself. Since I believe that the District Court erred in striking down the statute, and since the issue of the regulation's constitutionality has been argued in this Court only in passing, I would remand appellee Barley's cause for further consideration of that question.

respect to eligibility for AFDC assistance.[2]  In each instance, the welfare residence requirements are alleged to be unconstitutional on two grounds: *first,* because they impose an undue burden upon the constitutional right of welfare applicants to travel interstate; *second,* because they deny to persons who have recently moved interstate and would otherwise be eligible for welfare assistance the equal protection of the laws assured by the Fourteenth Amendment (in the state cases) or the analogous protection afforded by the Fifth Amendment (in the District of Columbia case).  Since the Court basically relies upon the equal protection ground, I shall discuss it first.

---

[2] I do not believe that the Pennsylvania appeal presents the additional question of the validity of a residence condition for a purely state-financed and state-authorized public assistance program.  The Pennsylvania welfare eligibility provision, Pa. Stat. Ann., Tit. 62, § 432 (1968), states:

"Except as hereinafter otherwise provided . . . , needy persons of the classes defined in clauses (1) and (2) of this section shall be eligible for assistance:

"(1) Persons for whose assistance Federal financial participation is available to the Commonwealth as . . . aid to families with dependent children, . . . and which assistance is not precluded by other provisions of law.

"(2) Other persons who are citizens of the United States . . . .

.            .            .            .            .

"(6) Assistance may be granted only to or in behalf of a person residing in Pennsylvania who (i) has resided therein for at least one year immediately preceding the date of application . . . ."

As I understand it, this statute initially divides Pennsylvania welfare applicants into two classes: (1) persons for whom federal financial assistance is available and not precluded by other provisions of federal law (if state law, including the residence requirement, were intended, the "Except as hereinafter otherwise provided" proviso at the beginning of the entire section would be surplusage); (2) other persons who are citizens.  The residence requirement applies to both classes.  However, since all of the Pennsylvania appellees clearly fall into the first or federally assisted class, there is no need to consider whether residence conditions may constitutionally be imposed with respect to the second or purely state-assisted class.

## II.

In upholding the equal protection argument,[3] the Court has applied an equal protection doctrine of relatively recent vintage: the rule that statutory classifications which either are based upon certain "suspect" criteria or affect "fundamental rights" will be held to deny equal protection unless justified by a "compelling" governmental interest. See *ante,* at 627, 634, 638.

The "compelling interest" doctrine, which today is articulated more explicitly than ever before, constitutes an increasingly significant exception to the long-established rule that a statute does not deny equal protection if it is rationally related to a legitimate governmental objective.[4] The "compelling interest" doctrine has two branches. The branch which requires that classifications based upon "suspect" criteria be supported by a compelling interest apparently had its genesis in cases involving racial classifications, which have, at least since *Korematsu* v. *United States,* 323 U. S. 214, 216 (1944), been regarded as inherently "suspect." [5] The criterion of "wealth" apparently was added to the list of "suspects" as an alternative justification for the rationale in *Harper*

---

[3] In characterizing this argument as one based on an alleged denial of equal protection of the laws, I do not mean to disregard the fact that this contention is applicable in the District of Columbia only through the terms of the Due Process Clause of the Fifth Amendment. Nor do I mean to suggest that these two constitutional phrases are "always interchangeable," see *Bolling* v. *Sharpe,* 347 U. S. 497, 499 (1954). In the circumstances of this case, I do not believe myself obliged to explore whether there may be any differences in the scope of the protection afforded by the two provisions.

[4] See, *e. g., Rapid Transit Corp.* v. *City of New York,* 303 U. S. 573, 578 (1938). See also *infra,* at 662.

[5] See *Loving* v. *Virginia,* 388 U. S. 1, 11 (1967); cf. *Bolling* v. *Sharpe,* 347 U. S. 497, 499 (1954). See also *Hirabayashi* v. *United States,* 320 U. S. 81, 100 (1943); *Yick Wo* v. *Hopkins,* 118 U. S. U. S. 356 (1886).

v. *Virginia Bd. of Elections,* 383 U. S. 663, 668 (1966), in which Virginia's poll tax was struck down. The criterion of political allegiance may have been added in *Williams* v. *Rhodes,* 393 U. S. 23 (1968).[6] Today the list apparently has been further enlarged to include classifications based upon recent interstate movement, and perhaps those based upon the exercise of *any* constitutional right, for the Court states, *ante,* at 634:

> "The waiting-period provision denies welfare benefits to otherwise eligible applicants solely because they have recently moved into the jurisdiction. But in moving . . . appellees were exercising a constitutional right, and any classification which serves to penalize the exercise of that right, unless shown to be necessary to promote a *compelling* governmental interest, is unconstitutional." [7]

I think that this branch of the "compelling interest" doctrine is sound when applied to racial classifications, for historically the Equal Protection Clause was largely a product of the desire to eradicate legal distinctions founded upon race. However, I believe that the more recent extensions have been unwise. For the reasons stated in my dissenting opinion in *Harper* v. *Virginia Bd. of Elections, supra,* at 680, 683–686, I do not consider wealth a "suspect" statutory criterion. And when, as in *Williams* v. *Rhodes, supra,* and the present case, a classification is based upon the exercise of rights guaranteed against state infringement by the Federal Constitution, then there is no need for any resort to the Equal Protection Clause; in such instances, this Court may properly and straightforwardly invalidate any undue burden upon those rights under the Fourteenth Amendment's Due Process Clause. See, *e. g.,* my separate opinion in *Williams* v. *Rhodes, supra,* at 41.

---

[6] See n. 9, *infra.*

[7] See n. 9, *infra.*

The second branch of the "compelling interest" principle is even more troublesome. For it has been held that a statutory classification is subject to the "compelling interest" test if the result of the classification may be to affect a "fundamental right," regardless of the basis of the classification. This rule was foreshadowed in *Skinner* v. *Oklahoma,* 316 U. S. 535, 541 (1942), in which an Oklahoma statute providing for compulsory sterilization of "habitual criminals" was held subject to "strict scrutiny" mainly because it affected "one of the basic civil rights." After a long hiatus, the principle re-emerged in *Reynolds* v. *Sims,* 377 U. S. 533, 561–562 (1964), in which state apportionment statutes were subjected to an unusually stringent test because "any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." *Id.,* at 562. The rule appeared again in *Carrington* v. *Rash,* 380 U. S. 89, 96 (1965), in which, as I now see that case,[8] the Court applied an abnormally severe equal protection standard to a Texas statute denying certain servicemen the right to vote, without indicating that the statutory distinction between servicemen and civilians was generally "suspect." This branch of the doctrine was also an alternate ground in *Harper* v. *Virginia Bd. of Elections, supra,* see 383 U. S., at 670, and apparently was a basis of the holding in *Williams* v. *Rhodes, supra.*[9] It

---

[8] I recognize that in my dissenting opinion in *Harper* v. *Virginia Bd. of Elections, supra,* at 683, I characterized the test applied in *Carrington* as "the traditional equal protection standard." I am now satisfied that this was too generous a reading of the Court's opinion.

[9] Analysis is complicated when the statutory classification is grounded upon the exercise of a "fundamental" right. For then the statute may come within the first branch of the "compelling interest" doctrine because exercise of the right is deemed a "suspect" criterion and also within the second because the statute is considered to affect the right by deterring its exercise. *Williams* v. *Rhodes, supra,* is such a case insofar as the statutes involved both inhibited exercise of the

has reappeared today in the Court's cryptic suggestion, *ante,* at 627, that the "compelling interest" test is applicable merely because the result of the classification may be to deny the appellees "food, shelter, and other necessities of life," as well as in the Court's statement, *ante,* at 638, that "[s]ince the classification here touches on the fundamental right of interstate movement, its constitutionality must be judged by the stricter standard of whether it promotes a *compelling* state interest." [10]

I think this branch of the "compelling interest" doctrine particularly unfortunate and unnecessary. It is unfortunate because it creates an exception which threatens to swallow the standard equal protection rule. Virtually every state statute affects important rights. This Court has repeatedly held, for example, that the traditional equal protection standard is applicable to statutory classifications affecting such fundamental matters as the right to pursue a particular occupation,[11] the right to receive greater or smaller wages [12] or to work more or less hours,[13] and the right to inherit property.[14] Rights such as these are in principle indistinguishable from those involved here, and to extend the "compelling interest" rule to all cases in which such rights are affected would go far toward making this Court a "super-legislature." This branch of the doctrine is also unnecessary. When the right affected is one assured by

right of political association and drew distinctions based upon the way the right was exercised. The present case is another instance, insofar as welfare residence statutes both deter interstate movement and distinguish among welfare applicants on the basis of such movement. Consequently, I have not attempted to specify the branch of the doctrine upon which these decisions rest.

[10] See n. 9, *supra.*

[11] See, *e. g., Williamson* v. *Lee Optical Co.,* 348 U. S. 483 (1955); *Kotch* v. *Board of River Pilot Comm'rs,* 330 U. S. 552 (1947).

[12] See, *e. g., Bunting* v. *Oregon,* 243 U. S. 426 (1917).

[13] See, *e. g., Miller* v. *Wilson,* 236 U. S. 373 (1915).

[14] See, *e. g., Ferry* v. *Spokane, P. & S. R. Co.,* 258 U. S. 314 (1922).

the Federal Constitution, any infringement can be dealt with under the Due Process Clause. But when a statute affects only matters not mentioned in the Federal Constitution and is not arbitrary or irrational, I must reiterate that I know of nothing which entitles this Court to pick out particular human activities, characterize them as "fundamental," and give them added protection under an unusually stringent equal protection test.

I shall consider in the next section whether welfare residence requirements deny due process by unduly burdening the right of interstate travel. If the issue is regarded purely as one of equal protection, then, for the reasons just set forth, this nonracial classification should be judged by ordinary equal protection standards. The applicable criteria are familiar and well established. A legislative measure will be found to deny equal protection only if "it is without any reasonable basis and therefore is purely arbitrary." *Lindsley* v. *Natural Carbonic Gas Co.,* 220 U. S. 61, 78 (1911). It is not enough that the measure results incidentally "in some inequality," or that it is not drawn "with mathematical nicety," *ibid.;* the statutory classification must instead cause "different treatments . . . so disparate, relative to the difference in classification, as to be wholly arbitrary." *Walters* v. *City of St. Louis,* 347 U. S. 231, 237 (1954). Similarly, this Court has stated that where, as here, the issue concerns the authority of Congress to withhold "a noncontractual benefit under a social welfare program . . . , the Due Process Clause [of the Fifth Amendment] can be thought to interpose a bar only if the statute manifests a patently arbitrary classification, utterly lacking in rational justification." *Flemming* v. *Nestor,* 363 U. S. 603, 611 (1960).

For reasons hereafter set forth, see *infra,* at 672–677, a legislature might rationally find that the imposition of a welfare residence requirement would aid in the accomplishment of at least four valid governmental ob-

jectives. It might also find that residence requirements have advantages not shared by other methods of achieving the same goals. In light of this undeniable relation of residence requirements to valid legislative aims, it cannot be said that the requirements are "arbitrary" or "lacking in rational justification." Hence, I can find no objection to these residence requirements under the Equal Protection Clause of the Fourteenth Amendment or under the analogous standard embodied in the Due Process Clause of the Fifth Amendment.

## III.

The next issue, which I think requires fuller analysis than that deemed necessary by the Court under its equal protection rationale, is whether a one-year welfare residence requirement amounts to an undue burden upon the right of interstate travel. Four considerations are relevant: *First,* what is the constitutional source and nature of the right to travel which is relied upon? *Second,* what is the extent of the interference with that right? *Third,* what governmental interests are served by welfare residence requirements? *Fourth,* how should the balance of the competing considerations be struck?

The initial problem is to identify the source of the right to travel asserted by the appellees. Congress enacted the welfare residence requirement in the District of Columbia, so the right to travel which is invoked in that case must be enforceable against *congressional* action. The residence requirements challenged in the Pennsylvania and Connecticut appeals were authorized by Congress in 42 U. S. C. § 602 (b), so the right to travel relied upon in those cases must be enforceable against the States even though they have acted with congressional approval.

In my view, it is playing ducks and drakes with the statute to argue, as the Court does, *ante,* at 639–641, that Congress did not mean to *approve* these state residence

requirements. In 42 U. S. C. § 602 (b), quoted more fully, *ante,* at 638–639, Congress directed that:

> "[t]he Secretary shall approve any [state assistance] plan which fulfills the conditions specified in subsection (a) of this section, except that he shall not approve any plan which imposes as a condition of eligibility for [AFDC aid] a residence requirement [equal to or greater than one year]."

I think that by any fair reading this section must be regarded as conferring congressional approval upon any plan containing a residence requirement of up to one year.

If any reinforcement is needed for taking this statutory language at face value, the overall scheme of the AFDC program and the context in which it was enacted suggest strong reasons why Congress would have wished to approve limited state residence requirements. Congress determined to enlist state assistance in financing the AFDC program, and to administer the program primarily through the States. A previous Congress had already enacted a one-year residence requirement with respect to aid for dependent children in the District of Columbia.[15] In these circumstances, I think it only sensible to conclude that in allowing the States to impose limited residence conditions despite their possible impact on persons who wished to move interstate,[16] Congress was motivated by a desire to encourage state participation in

---

[15] See 44 Stat. 758, § 1.

[16] The arguments for and against welfare residence requirements, including their impact on indigent migrants, were fully aired in congressional committee hearings. See, *e. g.,* Hearings on H. R. 4120 before the House Committee on Ways and Means, 74th Cong., 1st Sess., 831–832, 861–871 (1935); Hearings on S. 1130 before the Senate Committee on Finance, 74th Cong., 1st Sess., 522–540, 643, 656 (1935).

the AFDC program,[17] as well as by a feeling that the States should at least be permitted to impose residence requirements as strict as that already authorized for the District of Columbia. Congress therefore had a genuine federal purpose in allowing the States to use residence tests. And I fully agree with THE CHIEF JUSTICE that this purpose would render § 602 (b) a permissible exercise of Congress' power under the Commerce Clause, unless Congress were prohibited from acting by another provision of the Constitution.

Nor do I find it credible that Congress intended to refrain from expressing approval of state residence requirements because of doubts about their constitutionality or their compatibility with the Act's beneficent purposes. With respect to constitutionality, a similar residence requirement was already in effect for the District of Columbia, and the burdens upon travel which might be caused by such requirements must, even in 1935, have been regarded as within the competence of Congress under its commerce power. If Congress had thought residence requirements entirely incompatible with the aims of the Act, it could simply have provided that state assistance plans containing such requirements should not be approved at all, rather than having limited approval to plans containing residence requirements of less than one year. Moreover, when Congress in 1944 revised the AFDC program in the District of Columbia to conform with the standards of the Act, it chose to condition eligibility upon one year's residence,[18] thus strongly indicating that

[17] I am not at all persuaded by the Court's argument that Congress' sole purpose was to compel " '[l]iberality of residence requirement.' " See ante, at 640. If that was the only objective, it could have been more effectively accomplished by specifying that to qualify for approval under the Act a state assistance plan must contain no residence requirement.

[18] See Act to provide aid to dependent children in the District of Columbia § 3, 58 Stat. 277 (1944). In 1962, this Act was repealed

it doubted neither the constitutionality of such a provision nor its consistency with the Act's purposes.[19]

Opinions of this Court and of individual Justices have suggested four provisions of the Constitution as possible sources of a right to travel enforceable against the federal or state governments: the Commerce Clause;[20] the Privileges and Immunities Clause of Art. IV, § 2;[21] the Privileges and Immunities Clause of the Fourteenth Amendment;[22] and the Due Process Clause of the Fifth Amendment.[23] The Commerce Clause can be of no assistance to these appellees, since that clause grants plenary power to Congress,[24] and Congress either enacted or approved all of the residence requirements here challenged. The Privileges and Immunities Clause of Art. IV, § 2,[25] is irrelevant, for it appears settled that this clause neither limits federal power nor prevents a State from distinguishing among its own citizens, but simply "prevents a State from discriminating against citizens of other States in favor of its own." *Hague* v. *CIO,* 307 U. S. 496, 511 (1939) (opinion of Roberts, J.); see *Slaughter-House Cases,* 16 Wall. 36, 77 (1873). Since Congress enacted the District of Columbia residence statute, and since the Pennsylvania and Connecticut appellees were residents

and replaced by D. C. Code § 3–203, the provision now being challenged. See 76 Stat. 914.

[19] Cf. *ante,* at 639–641 and nn. 24–25.

[20] See, *e. g., Edwards* v. *California,* 314 U. S. 160 (1941); the *Passenger Cases,* 7 How. 283 (1849).

[21] See, *e. g., Corfield* v. *Coryell,* 6 F. Cas. 546 (No. 3230) (1825) (Mr. Justice Washington).

[22] See, *e. g., Edwards* v. *California,* 314 U. S. 160, 177, 181 (1941) (DOUGLAS and Jackson, JJ., concurring); *Twining* v. *New Jersey,* 211 U. S. 78, 97 (1908) (dictum).

[23] See, *e. g., Kent* v. *Dulles,* 357 U. S. 116, 125–127 (1958); *Aptheker* v. *Secretary of State,* 378 U. S. 500, 505–506 (1964).

[24] See, *e. g., Prudential Ins. Co.* v. *Benjamin,* 328 U. S. 408, 423 (1946). See also *Maryland* v. *Wirtz,* 392 U. S. 183, 193–199 (1968).

[25] "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."

and therefore citizens of those States when they sought welfare, the clause can have no application in any of these cases.

The Privileges and Immunities Clause of the Fourteenth Amendment provides that: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States." It is evident that this clause cannot be applicable in the District of Columbia appeal, since it is limited in terms to instances of state action. In the Pennsylvania and Connecticut cases, the respective States did impose and enforce the residence requirements. However, Congress approved these requirements in 42 U. S. C. § 602 (b). The fact of congressional approval, together with this Court's past statements about the nature of the Fourteenth Amendment Privileges and Immunities Clause, leads me to believe that the clause affords no additional help to these appellees, and that the decisive issue is whether Congress itself may impose such requirements. The view of the Privileges and Immunities Clause which has most often been adopted by the Court and by individual Justices is that it extends only to those "privileges and immunities" which "arise or grow out of the relationship of United States citizens to the national government." *Hague* v. *CIO*, 307 U. S. 496, 520 (1939) (opinion of Stone, J.).[26] On the authority of *Crandall* v. *Nevada*, 6 Wall. 35 (1868), those privileges and immunities have repeatedly been said to include the right to travel from State to State,[27] presumably for the reason assigned in *Crandall:* that state restrictions on travel

---

[26] See *Slaughter-House Cases,* 16 Wall. 36, 79 (1873); *In re Kemmler,* 136 U. S. 436, 448 (1890); *McPherson* v. *Blacker,* 146 U. S. 1, 38 (1892); *Giozza* v. *Tiernan,* 148 U. S. 657, 661 (1893); *Duncan* v. *Missouri,* 152 U. S. 377, 382 (1894); *Twining* v. *New Jersey,* 211 U. S. 78, 97–98 (1908).

[27] See, *e. g., Slaughter-House Cases, supra,* at 79; *Twining* v. *New Jersey, supra,* at 97.

might interfere with intercourse between the Federal Government and its citizens.[28] This kind of objection to state welfare residence requirements would seem necessarily to vanish in the face of congressional authorization, for except in those instances when its authority is limited by a constitutional provision binding upon it (as the Fourteenth Amendment is not), Congress has full power to define the relationship between citizens and the Federal Government.

Some Justices, notably the dissenters in the *Slaughter-House Cases,* 16 Wall. 36, 83, 111, 124 (1873) (Field, Bradley, and Swayne, JJ., dissenting), and the concurring Justices in *Edwards* v. *California,* 314 U. S. 160, 177, 181 (1941) (DOUGLAS and Jackson, JJ., concurring), have gone further and intimated that the Fourteenth Amendment right to travel interstate is a concomitant of federal citizenship which stems from sources even more basic than the need to protect citizens in their relations with the Federal Government. The *Slaughter-House* dissenters suggested that the privileges and immunities of national citizenship, including freedom to travel, were those natural rights "which of right belong to the citizens of all free governments," 16 Wall., at 98 (Field, J.). However, since such rights are "the rights of citizens of any free government," *id.,* at 114 (Bradley, J.), it would appear that they must be immune from national as well as state abridgment. To the extent that they may be validly limited by Congress, there would seem to be no reason why they may not be similarly abridged by States acting with congressional approval.

The concurring Justices in *Edwards* laid emphasis not upon natural rights but upon a generalized concern for the functioning of the federal system, stressing that to

---

[28] The *Crandall* Court stressed the "right" of a citizen to come to the national capital, to have access to federal officials, and to travel to seaports. See 6 Wall., at 44. Of course, *Crandall* was decided before the enactment of the Fourteenth Amendment.

allow a State to curtail "the rights of *national* citizenship would be to contravene every conception of national unity," 314 U. S., at 181 (DOUGLAS, J.), and that "[i]f national citizenship means less than [the right to move interstate] it means nothing." *Id.,* at 183 (Jackson, J.). However, even under this rationale the clause would appear to oppose no obstacle to congressional delineation of the rights of national citizenship, insofar as Congress may do so without infringing other provisions of the Constitution. Mr. Justice Jackson explicitly recognized in *Edwards* that: "The right of the citizen to migrate from state to state . . . [is] subject to all constitutional limitations imposed by the federal government," *id.,* at 184. And nothing in the nature of federalism would seem to prevent Congress from authorizing the States to do what Congress might validly do itself. Indeed, this Court has held, for example, that Congress may empower the States to undertake regulations of commerce which would otherwise be prohibited by the negative implications of the Commerce Clause. See *Prudential Ins. Co.* v. *Benjamin,* 328 U. S. 408 (1946). Hence, as has already been suggested, the decisive question is whether Congress may legitimately enact welfare residence requirements, and the Fourteenth Amendment Privileges and Immunities Clause adds no extra force to the appellees' attack on the requirements.

The last possible source of a right to travel is one which does operate against the Federal Government: the Due Process Clause of the Fifth Amendment.[29] It is now set-

---

[29] Professor Chafee has suggested that the Due Process Clause of the Fourteenth Amendment may similarly protect the right to travel against state interference. See Z. Chafee, Three Human Rights in the Constitution of 1787, p. 192 (1956). However, that clause surely provides no greater protection against the States than does the Fifth Amendment clause against the Federal Government; so the decisive question still is whether Congress may enact a residence requirement.

tled that freedom to travel is an element of the "liberty" secured by that clause. In *Kent* v. *Dulles*, 357 U. S. 116, 125–126 (1958), the Court said:

"The right to travel is a part of the 'liberty' of which the citizen cannot be deprived without due process of law under the Fifth Amendment. . . . Freedom of movement across frontiers . . . , and inside frontiers as well, was a part of our heritage. . . ."

The Court echoed these remarks in *Aptheker* v. *Secretary of State*, 378 U. S. 500, 505–506 (1964), and added:

"Since this case involves a personal liberty protected by the Bill of Rights, we believe that the proper approach to legislation curtailing that liberty must be that adopted by this Court in *NAACP* v. *Button*, 371 U. S. 415, and *Thornhill* v. *Alabama*, 310 U. S. 88. . . . [S]ince freedom of travel is a constitutional liberty closely related to rights of free speech and association, we believe that appellants . . . should not be required to assume the burden of demonstrating that Congress could not have written a statute constitutionally prohibiting their travel." *Id.*, at 516–517.

However, in *Zemel* v. *Rusk*, 381 U. S. 1 (1965), the First Amendment cast of the *Aptheker* opinion was explained as having stemmed from the fact that Aptheker was forbidden to travel because of "expression or association on his part," *id.*, at 16. The Court noted that Zemel was "not being forced to choose between membership in an organization and freedom to travel," *ibid.*, and held that the mere circumstance that Zemel's proposed journey to Cuba might be used to collect information of political and social significance was not enough to bring the case within the First Amendment category.

Finally, in *United States* v. *Guest*, 383 U. S. 745 (1966), the Court again had occasion to consider the right of

interstate travel. Without specifying the source of that right, the Court said:

"The constitutional right to travel from one State to another . . . occupies a position fundamental to the concept of our Federal Union. It is a right that has been firmly established and repeatedly recognized. . . . [The] right finds no explicit mention in the Constitution. The reason, it has been suggested, is that a right so elementary was conceived from the beginning to be a necessary concomitant of the stronger Union the Constitution created. In any event, freedom to travel throughout the United States has long been recognized as a basic right under the Constitution." *Id.,* at 757–758. (Footnotes omitted.)

I therefore conclude that the right to travel interstate is a "fundamental" right which, for present purposes, should be regarded as having its source in the Due Process Clause of the Fifth Amendment.

The next questions are: (1) To what extent does a one-year residence condition upon welfare eligibility interfere with this right to travel?; and (2) What are the governmental interests supporting such a condition? The consequence of the residence requirements is that persons who contemplate interstate changes of residence, and who believe that they otherwise would qualify for welfare payments, must take into account the fact that such assistance will not be available for a year after arrival. The number or proportion of persons who are actually deterred from changing residence by the existence of these provisions is unknown. If one accepts evidence put forward by the appellees,[30] to the effect

---

[30] See Brief for Appellees in No. 33, pp. 49–51 and n. 70; Brief for Appellees in No. 34, p. 24, n. 11; Supplemental Brief for Appellees on Reargument 27–30.

that there would be only a minuscule increase in the number of welfare applicants were existing residence requirements to be done away with, it follows that the requirements do not deter an appreciable number of persons from moving interstate.

Against this indirect impact on the right to travel must be set the interests of the States, and of Congress with respect to the District of Columbia, in imposing residence conditions. There appear to be four such interests. First, it is evident that a primary concern of Congress and the Pennsylvania and Connecticut Legislatures was to deny welfare benefits to persons who moved into the jurisdiction primarily in order to collect those benefits.[31] This seems to me an entirely legitimate objective. A legislature is certainly not obliged to furnish welfare assistance to every inhabitant of the jurisdiction, and it is entirely rational to deny benefits to those who enter primarily in order to receive them, since this will make more funds available for those whom the legislature deems more worthy of subsidy.[32]

---

[31] For Congress, see, e. g., Problems of Hungry Children in the District of Columbia, Hearings before the Subcommittee on Public Health, Education, Welfare, and Safety of the Senate Committee on the District of Columbia, 85th Cong., 1st Sess. For Connecticut, see Connecticut General Assembly, 1965 Feb. Spec. Sess., House of Representatives Proceedings, Vol. II, pt. 7, at 3505. For Pennsylvania, see Appendix in No. 34, pp. 96a–98a.

[32] There is support for the view that enforcement of residence requirements can significantly reduce welfare costs by denying benefits to those who come solely to collect them. For example, in the course of a long article generally critical of residence requirements, and after a detailed discussion of the available information, Professor Harvith has stated:

"A fair conclusion seems to be that, in at least some states, it is not unreasonable for the legislature to conclude that a useful saving in welfare costs may be obtained by residence tests discouraging those who would enter the state solely because of its welfare programs. In New York, for example, a one per cent saving in

A second possible purpose of residence requirements is the prevention of fraud. A residence requirement provides an objective and workable means of determining that an applicant intends to remain indefinitely within the jurisdiction. It therefore may aid in eliminating fraudulent collection of benefits by nonresidents and persons already receiving assistance in other States. There can be no doubt that prevention of fraud is a valid legislative goal. Third, the requirement of a fixed period of residence may help in predicting the budgetary amount which will be needed for public assistance in the future. While none of the appellant jurisdictions appears to keep data sufficient to permit the making of detailed budgetary predictions in consequence of the requirement,[33] it is probable that in the event of a very large increase or decrease in the number of indigent newcomers the waiting period would give the legislature time to make needed adjustments in the welfare laws. Obviously, this is a proper objective. Fourth, the residence requirements conceivably may have been predicated upon a legislative desire to restrict welfare payments financed in part by state tax funds to persons who have

---

welfare costs would amount to several million dollars." Harvith, The Constitutionality of Residence Tests for General and Categorical Assistance Programs, 54 Calif. L. Rev. 567, 618 (1966). (Footnotes omitted.) See also *Helvering* v. *Davis,* 301 U. S. 619, 644 (1937).

For essentially the same reasons, I would uphold the Connecticut welfare regulations which except from the residence requirement persons who come to Connecticut with a bona fide job offer or with resources sufficient to support them for three months. See 1 Conn. Welfare Manual, c. II, §§ 219.1–219.2 (1966). Such persons are very unlikely to have entered the State primarily in order to receive welfare benefits.

[33] For precise prediction to be possible, it would appear that a residence requirement must be combined with a procedure for ascertaining the number of indigent persons who enter the jurisdiction and the proportion of those persons who will remain indigent during the residence period.

recently made some contribution to the State's economy, through having been employed, having paid taxes, or having spent money in the State. This too would appear to be a legitimate purpose.[34]

The next question is the decisive one: whether the governmental interests served by residence requirements outweigh the burden imposed upon the right to travel. In my view, a number of considerations militate in favor of constitutionality. First, as just shown, four separate, legitimate governmental interests are furthered by residence requirements. Second, the impact of the requirements upon the freedom of individuals to travel interstate is indirect and, according to evidence put forward by the appellees themselves, insubstantial. Third, these are not cases in which a State or States, acting alone, have attempted to interfere with the right of citizens to travel, but one in which the States have acted within the terms of a limited authorization by the National Government, and in which Congress itself has laid down a like rule for the District of Columbia. Fourth, the legislatures which enacted these statutes have been fully exposed to the arguments of the appellees as to why these residence requirements are unwise, and have rejected them. This is not, therefore, an instance in which legislatures have acted without mature deliberation.

Fifth, and of longer-range importance, the field of welfare assistance is one in which there is a widely recognized need for fresh solutions and consequently for experimentation. Invalidation of welfare residence

---

[34] I do not mean to imply that each of the above purposes necessarily was sought by each of the legislatures that adopted durational residence requirements. In Connecticut, for example, the welfare budget is apparently open-ended, suggesting that this State is not seriously concerned with the need for more accurate budgetary estimates.

requirements might have the unfortunate consequence of discouraging the Federal and State Governments from establishing unusually generous welfare programs in particular areas on an experimental basis, because of fears that the program would cause an influx of persons seeking higher welfare payments. Sixth and finally, a strong presumption of constitutionality attaches to statutes of the types now before us. Congressional enactments come to this Court with an extremely heavy presumption of validity. See, *e. g., Brown* v. *Maryland,* 12 Wheat. 419, 436 (1827); *Insurance Co.* v. *Glidden Co.,* 284 U. S. 151, 158 (1931); *United States* v. *Butler,* 297 U. S. 1, 67 (1936); *United States* v. *National Dairy Corp.,* 372 U. S. 29, 32 (1963). A similar presumption of constitutionality attaches to state statutes, particularly when, as here, a State has acted upon a specific authorization from Congress. See, *e. g., Powell* v. *Pennsylvania,* 127 U. S. 678, 684–685 (1888); *United States* v. *Des Moines N. & R. Co.,* 142 U. S. 510, 544–545 (1892).

I do not consider that the factors which have been urged to outweigh these considerations are sufficient to render unconstitutional these state and federal enactments. It is said, first, that this Court, in the opinions discussed, *supra,* at 669–671, has acknowledged that the right to travel interstate is a "fundamental" freedom. Second, it is contended that the governmental objectives mentioned above either are ephemeral or could be accomplished by means which do not impinge as heavily on the right to travel, and hence that the requirements are unconstitutional because they "sweep unnecessarily broadly and thereby invade the area of protected freedoms." *NAACP* v. *Alabama,* 377 U. S. 288, 307 (1964). The appellees claim that welfare payments could be denied those who come primarily to collect welfare by means of less restrictive provisions, such as New York's

Welfare Abuses Law;[35] that fraud could be prevented by investigation of individual applicants or by a much shorter residence period; that budgetary predictability is a remote and speculative goal; and that assurance of investment in the community could be obtained by a shorter residence period or by taking into account prior intervals of residence in the jurisdiction.

Taking all of these competing considerations into account, I believe that the balance definitely favors constitutionality. In reaching that conclusion, I do not minimize the importance of the right to travel interstate. However, the impact of residence conditions upon that right is indirect and apparently quite insubstantial. On the other hand, the governmental purposes served by the requirements are legitimate and real, and the residence requirements are clearly suited to their accomplishment. To abolish residence requirements might well discourage highly worthwhile experimentation in the welfare field. The statutes come to us clothed with the authority of Congress and attended by a correspondingly heavy presumption of constitutionality. Moreover, although the appellees assert that the same objectives could have been achieved by less restrictive means, this is an area in which the judiciary should be especially slow to fetter the judgment of Congress and of some 46 state legislatures[36] in the choice of methods. Residence requirements have

---

[35] That law, N. Y. Soc. Welfare Law § 139–a, requires public welfare officials to conduct a detailed investigation in order to ascertain whether a welfare "applicant came into the state for the purpose of receiving public assistance or care and accordingly is undeserving of and ineligible for assistance . . . ."

[36] The figure may be variously calculated. There was testimony before the District Court in the Pennsylvania case that 46 States had some form of residence requirement for welfare assistance. Appendix in No. 34, pp. 92a–93a. It was stipulated in the Connecticut case that in 1965, 40 States had residence requirements for aid to dependent children. Appendix to Appellant's Brief in No. 9, p. 45a. See also *ante,* at 639–640 and n. 22.

advantages, such as administrative simplicity and relative certainty, which are not shared by the alternative solutions proposed by the appellees. In these circumstances, I cannot find that the burden imposed by residence requirements upon ability to travel outweighs the governmental interests in their continued employment. Nor do I believe that the period of residence required in these cases—one year—is so excessively long as to justify a finding of unconstitutionality on that score.

I conclude with the following observations. Today's decision, it seems to me, reflects to an unusual degree the current notion that this Court possesses a peculiar wisdom all its own whose capacity to lead this Nation out of its present troubles is contained only by the limits of judicial ingenuity in contriving new constitutional principles to meet each problem as it arises. For anyone who, like myself, believes that it is an essential function of this Court to maintain the constitutional divisions between state and federal authority and among the three branches of the Federal Government, today's decision is a step in the wrong direction. This resurgence of the expansive view of "equal protection" carries the seeds of more judicial interference with the state and federal legislative process, much more indeed than does the judicial application of "due process" according to traditional concepts (see my dissenting opinion in *Duncan* v. *Louisiana*, 391 U. S. 145, 171 (1968)), about which some members of this Court have expressed fears as to its potentialities for setting us judges "at large." [37] I consider it particularly unfortunate that this judicial roadblock to the powers of Congress in this field should occur at the very threshold of the current discussions regarding the "federalizing" of these aspects of welfare relief.

---

[37] Cf. *Harper* v. *Virginia Bd. of Elections*, 383 U. S. 663, 670, 675-680 (BLACK, J., dissenting).