Thomas EDWARDS, Jeanette Caldwell, and John Vigil, Plaintiffs,

v.

Ruben VALDEZ, Executive Director, Colorado Department of Labor; John Kezer, Director, Division of Employment and Training; and Industrial Commission of Colorado (Ex-Officio the Unemployment Compensation Commission), in their official capacities, Defendants.

Civ. A. No. 83–Z–2492.

United States District Court, D. Colorado.

Feb. 13, 1985.

Melody K. Fuller, Legal Aid Society of Metro Denver, Daniel M. Taubman, Colorado Coalition of Legal Services Programs, Denver, Colo., Jackson L. Peters, Jr., Pikes Peak Legal Services, Colorado 'Springs, Colo., for plaintiffs.

Timothy R. Arnold, First Asst. Atty. Gen., Human Resources Section, Denver, Colo., for defendants.

## MEMORANDUM OPINION AND ORDER

WEINSHIENK, District Judge.

This case is before the Court on Cross Motions for Summary Judgment on a matter of statutory interpretation. Jurisdiction is proper pursuant to 28 U.S.C. § 1331, original actions under the constitution; § 1343(a)(3), original jurisdiction for 42 U.S.C. § 1983 actions; §§ 2201, 2202, and Fed.R.Civ.P. Rules 57 and 65 for declaratory and injunctive relief.

Plaintiffs in this action are three Colorado residents who retired with vested social security benefits and began to receive social security payments. Each plaintiff returned to the work force, worked for a new employer, was laid off, and qualified for unemployment insurance benefits. Defendants deducted, or offset, plaintiffs' social security benefits from the unemployment insurance benefits to which the plaintiffs were entitled. All material facts are covered by an extensive stipulation filed by the parties; no genuine issues of material fact remain.

The parties have stipulated that the requirements are satisfied to certify a 23(b)(2) class with plaintiffs as class representatives if the Court determines the liability issue in favor of plaintiffs.

Three issues are before this Court:

1. Does the Federal Unemployment Tax Act (FUTA), 26 U.S.C. § 3304(a)(15)(A)(i), authorize deduction of social security (and Railroad Retirement Act) benefits when such retirement benefits are based upon work for an employer who is neither a "base period" nor a "chargeable" employer, for the purposes of determining eligibility for unemployment insurance, but the "base period" employer does participate in the social security program?

2. Does defendants' interpretation of the federal and Colorado statutes violate the Equal Protection clause of the U.S. Constitution?

3. Did the Colorado legislature, in enacting C.R.S. § 8–73–110(3), exceed the federal pension-offset level or did it intend the Colorado statute to be interpreted just as the federal statute is interpreted?

## I. AMBIGUITY OF STATUTORY LANGUAGE

■ The first question in interpreting the language of the statute is to determine whether it is ambiguous, as plaintiffs contend, or whether the language is clear and unambiguous, as defendants assert. Legislative history may be analyzed for evidence of congressional intent, but if statutory language is clear there is no need to consult legislative history.

The words of 26 U.S.C. § 3304(a)(15), as amended in 1980, are as follows:

[T]he amount of [unemployment] compensation payable to an individual for any week which begins after March 31, 1980, and which begins in a period with respect to which such individual is receiving a governmental or other pension, retirement or retired pay, annuity, or any other similar periodic payment which is based on the previous work of such individual shall be reduced (but not below zero) by an amount equal to the amount of such pension, retirement or retired pay, annuity, or other payment, which is reasonably attributable to such week except that—

(A) the requirements of this paragraph shall apply to any pension, retirement or retired pay, annuity, or other similar periodic payment only if—

(i) such pension, retirement or retired pay, annuity, or similar payment is under a plan maintained (or contributed to) by a base period employer or

chargeable employer (as determined under applicable law), and

(ii) in the case of such a payment not made under the Social Security Act or the Railroad Retirement Act of 1974, services performed for such employer by the individual after the beginning of the base period (or remuneration for such services) affect eligibility for, or increase the amount of, such pension, retirement or retired pay, annuity, or similar payment, and

(B) the State law may provide for limitations on the amount of any such a reduction to take into account contributions made by the individual for the pension, retirement or retired pay, annuity, or other similar periodic payment.

It is the conclusion of this Court that the language of this statute is ambiguous. The lack of clarity of the statutory language is illustrated by considering the following questions, which remain unanswered after a careful reading of the statute. For the purpose of these questions, the Court will assume Employer A is the social security employer and Employer B is the new employer in the base period.

1. Does the statute cover a situation in which the base period employer used to participate in the social security program, but no longer does so? That is, John Doe is fully vested for social security benefits, retires, begins to receive benefits, then goes to work for Employer B. Employer B used to participate in social security, but switched to a private pension program before Mr. Doe was employed. The statute says that, if Mr. Doe's pension is from a plan maintained by or contributed to by employer B, it must be offset. Should his social security be offset even though Employer B no longer contributes, because the plan is one "contributed to by" Employer B in the past?

2. How does the statute affect a situation in which Employer B is paying social security, but not on behalf of the individual employee? That is, John Doe comes to Employer B in the same condition as above.

Employer B offers Mr. Doe, and all his employees, an option to participate in either social security or a company pension plan. Employer B participates in, and contributes to, both plans. Mr. Doe chooses the company pension option. Should his social security be offset from unemployment benefits when Mr. Doe is laid off?

3. What is the effect of the statute in a situation in which the individual has already qualified for full benefits for social security under prior Employer A and comes to work for Employer B who also participates in the social security program? Should Mr. Doe's social security benefits be offset when his work at employer B does nothing to qualify him for social security benefits, nor affects those benefits in any significant way?

One logical meaning of (A)(i) would be that social security payments are offset only if the base period employer was one who "contributed to" the social security benefits of the specific employee before retirement. In other words, in interpreting the words of (A)(i), one could infer that the base period employer has not "contributed" to a plan for the employee if that employee never worked for him before the base period and if the employee's social security benefits were assured before he was ever employed by the base period employer.

The role of a court in interpreting a statute is "to construe the language so as to give effect to the intent of Congress," *United States v. American Trucking Association,* 310 U.S. 534, 542, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940), even if it means going beyond the surface, literal meaning of a statute with apparently unambiguous wording. *Hecker v. Edwards,* —— U.S. ——, 104 S.Ct. 1532, 1538, 79 L.Ed.2d 878 (1984). Legislative history may be considered where the plain meaning of the statute would lead to a result "plainly at variance with the policy of the legislation as a whole." *Ozawa v. United States,* 260 U.S. 178, 194, 43 S.Ct. 65, 67, 67 L.Ed. 199 (1922). In this case, the "plain meaning" seen by the defendants is clearly at odds with the policy of both the FUTA and the

1980 amendments, which include subsection 3304(a)(15)(A)(i).

This Court is aware that both the United States Courts of Appeals for the Ninth and Sixth Circuits have found the meaning of this statute to be clear on its face. *See Rivera v. Becerra,* 714 F.2d 887 (9th Cir. 1983); *Bowman v. Stumbo,* 735 F.2d 192 (6th Cir.1984). *See also Peare v. MacFarland,* 577 F.Supp. 791 (N.D.Ind.1984). With all due respect to those honorable courts, this Court is obligated to make an independent judgment interpreting the language of the statute. In this case, the language of the statute is ambiguous and its interpretation requires an examination of the legislative history and consideration of the purposes and intentions of Congress in passing and amending the law.

## II. LEGISLATIVE HISTORY AND INTENT

### A. General Purpose of Statute and Amendments

Congress enacted the federal-state unemployment insurance program in order to insure prompt wage replacement for unemployed workers and to cushion the economic stress of unemployment on the worker and his family for a limited period while he seeks reemployment. *See California Department of Human Resources v. Java,* 402 U.S. 121, 130, 91 S.Ct. 1347, 1353, 28 L.Ed.2d 666 (1971); Report of the Comm. on Economic Security: Hearings on S.1130 Before the Senate Comm. on Finance, 74th Cong., 1st Sess. 1321 (1935).

In 1976, Congress amended FUTA to require states to offset all pension benefits received by all claimants for unemployment insurance. Pub.L. No. 94–566, § 314(a). The pension offset requirement was added to FUTA in response to congressional concern that many elderly employees, after retiring or being laid off from their jobs, were collecting both pension benefits and unemployment benefits based upon the same period of work and contributions by the same employer. Congress enacted the 1976 pension-offset provision to prevent this practice of "double-dipping." *See, e.g.,*

126 Cong.Rec. H.624 (February 6, 1980) (remarks of Rep. Frenzel), 122 Cong.Rec. S.33,279–80 (1976) (remarks of Senators Long and Bartlett).

The original 1976 pension offset provision was overly broad in its reach, preventing double-dipping, but also causing pension-offsets to all employees who were legitimately claiming both pension and unemployment benefits. Congress delayed the effective date of the provision twice, with a final effective date of April 1, 1980, 91 Stat. 39, 45 (1977), to enable it to study the pension offset issue. Congress presented the issue to the National Commission on Unemployment Compensation, H.Conf.Rep. 94–1745, 94th Cong., 2d Sess. 116 (1976), U.S.Code Cong. & Admin.News 1976, p. 5997, and the Commission recommended that the provision be repealed. *Unemployment Compensation: Final Report,* pp. 33–34, July 1980. Within six months of the effective date of the 1976 pension offset provision, Congress passed legislation limiting its application.

Although defendants contend that the purpose behind these 1980 amendments to the 1976 offset provision was to incur fiscal savings for the government, this Court is not convinced. The 1976 pension offset provision was enacted with a fiscal purpose: to avoid double-dipping; but Congress enacted the 1980 amendments with the intent to rectify the basic unfairness of the 1976 total offset law. The comments of Senators Boren, Dole, and Javits all support the conclusion of this Court.

Comparing the proposed 1980 amendments to § 3304(a)(15) to the original statute, Senator Boren remarked:

[I]f a person has been working for a particular employer and he retires and starts receiving a pension from that employer, he cannot go down to the unemployment office and start drawing benefits as if he is unemployed. He is not unemployed. He is retired and he is drawing pension from his last employer. This would keep that provision of current law. However, it would take care of the

situation which [sic] a person might have earlier in life worked for a particular employer, let us say for 20 years. He starts to draw his pension, which is not enough to live on. He takes another job and works for the second employer for, let us say 10 years and then, because of an economic downturn, he is thrown out of work. Well, clearly, in that situation, he should not be denied the right to receive unemployment compensation because he might be drawing a pension for work which he finished doing for another employer some 10 or 15 years before. So the bill corrects that provision of the current law.

126 Cong.Rec. S.2095 (March 4, 1980). Senator Dole's remarks are to the same effect:

The offset provision was too broadly drafted in the original legislation and would penalize many legitimately unemployed individuals simply because they had earned pension benefits from a previous employer. Under the bill, only the portion of a pension contributed by the employer to whom the unemployment is attributable is required to be offset. This should assure that individuals who are actually unemployed rather than retired will not be penalized while conversely assuring that individuals who are, in fact, retired are not drawing unemployment benefits.

126 Cong.Rec. S.2096 (March 4, 1980). Senator Javits expressed the same view:

If a claimant has retired from an employer with a pension and has then taken another job, he or she has certainly demonstrated current labor market attachment and an intent to work. So application of the pension offset in these circumstances is unfair and unnecessary to prevent the abuse of the UI system by retirees that has been alleged.

126 Cong.Rec. S.2101 (March 4, 1980). *See also*, 126 Cong.Rec. S.12901 (September 18, 1980) (remarks of Senator Bradley), *infra* at II.D.; 126 Cong.Rec. S.2104 (March 4, 1980) (remarks of Senator Boren).

B. Interpretation of Subsection (A)(i)

In light of congressional intent to avoid double-dipping a single employer but to preclude pension offset when an individual, after retirement, has been employed and then laid off by a separate employer, the meaning of subsection (A)(i) is clarified. The language, "such pension, retirement or retired pay, annuity, or similar payment is under a plan maintained (or contributed to) by a base period employer or chargeable employer ..." must mean that the base period employer is also the social security employer. Only then would his payment of social security taxes "contribute to" the employee's retirement plan. If the base period employer is different from the social security employer, his social security payments to the general system would not help the individual's retirement plan. This reasoning is supported by the remarks of Senator Bradley, one of the sponsors of the 1980 amendment. *See* 126 Cong.Rec. S.12,-901 (September 18, 1980), quoted *infra* at section II.D.

Subsection (A)(i) was enacted by Congress on September 19, 1980, as part of H.R. 3904, the Multi-Employer Pension Plan Amendments Act of 1980. The language of (A)(i) was borrowed intact from two predecessor bills: H.R. 5507, which was the bill containing subsection (A)(i) as it first passed the House, and H.R. 4612, which was the bill containing subsection (A)(i) as it first passed the Senate. Because the language of subsection (A)(i) never changed in substance, the remarks by representatives and senators in discussing that subsection can shed light on the enacted law, whether the remarks were made in the early stages of discussion in February 1980, or at the time of passage in September 1980.

Several comments by legislators reflect congressional intent in passing the amendments. Senator Moynihan concluded that H.R. 4612 would "limit the offset to situations where an employee receives a pension from the same employer through which he receives unemployment compensation benefits." 126 Cong.Rec. S.2,099 (March 4,

1980). Senator Moynihan's remarks apply equally to social security and private pensions, because subsection (A)(i) makes no distinctions between them. Senator Chaffee, co-sponsor with Senator Bradley of the amendment enacted into law, explained that subsection (A)(i) was intended to "modif[y] the existing law to require that the reduction of unemployment benefits is only required if the pension comes from the last employer." 126 Cong.Rec. S.10,106 (July 29, 1980). This explanation affirms that, if a worker's social security pension rights are earned before he begins employment with his base period employer, no offset should be required under subsection (A)(i).

In the floor discussion of H.R. 5507, Representative Corman specifically mentioned how social security benefits would be treated under subsection (A)(i). "Under the bill, in the case of a social security beneficiary, a state would only be required to reduce his unemployment insurance payment if his employment during his base period would increase the amount of his social security benefit." 126 Cong.Rec. 2114 (February 6, 1980). This was the intention of Congress as to how (A)(i) would be interpreted before (A)(ii) was added to the statute.

## C. Interpretation of Subsection (A)(ii)

Plaintiffs and defendants agree that, prior to the Senate and House passage of the (A)(i) language, both the House and Senate added subsection (A)(ii) language, without the exclusion for social security, for the purpose of allowing its consideration by a conference committee. Senator Boren referred to the addition of (A)(ii) as a "housekeeping" measure that would be inserted into the bill with the proviso that it would not be effective. This was simply a courtesy to the House which had earlier passed H.R. 5507 with this language on February 6, 1980. 126 Cong.Rec. 4572 (March 4, 1980). The House had also added subsection (A)(ii) language, without the social security exclusion, as a "corrective amendment." 126 Cong.Rec. 2149 (February 6, 1980). Both Representative Corman and Representative Rousselot indicated that

subsection (A)(ii) was added merely to clarify subsection (A)(i), because subsection (A)(i) was confusing and "not drafted properly in the first place." *Id.* Mr. Corman indicated that the (A)(ii) addition did not change the meaning of subsection (A)(i) when he stated that the subsection (A)(ii) language was a "technical amendment" and he did not know of any objections to it. *Id.* This "technical amendment" simply clarified subsection (A)(i) and was not meant to cause a substantive change in the meaning or application of subsection (A)(i).

Subsection (A)(ii) provides that the offset provision shall apply if

in the case of such a payment not made under the Social Security Act or the Railroad Retirement Act of 1974, services performed for such employer by the individual after the beginning of the base period (or remuneration for such services) affect eligibility for, or increase the amount of, such pension, retirement or retired pay, annuity, or similar payment. . . .

Defendants contend that the plain meaning of subsection (A)(i) is reinforced by the language of (A)(ii), in which Congress did make distinctions between social security and other pensions regarding the effect of work for a base period employer that affects eligibility or amount of pension benefits. They argue that Congress knew how to distinguish treatment of social security benefits and how to make offset dependent on base period employment, causing a difference in the eligibility or amount of benefits. They contend that Congress did so, in (A)(ii), to the detriment of social security recipients. This argument takes the statutory language out of context. When the language is considered in light of the intentions of Congress and the legislative history, a more plausible and credible interpretation is evident, which satisfies congressional intent and a reasonable reading of the statute.

The (A)(ii) provision was added to the 1980 amendments by a House-Senate conference committee. The committee compromised between the Senate and House

versions. The House bill sponsored total exemption from offset for social security benefits, while the bill passed by the Senate, H.R. 3904, contained the same language that now appears as subsections (A)(i) and (B). The conference committee rejected the total exemption for social security desired by the House and "generally follow[ed] the Senate amendment," according to the conference committee report. H.R.Re. No. 13443, 96th Cong., 2d Sess. The Senate version, which was accepted, provided that all pensions would be subject to offset if the base period employer was the same employer as the employer whose contributions resulted in social security benefits. The (A)(ii) language was added in a spirit of compromise to appease the House by providing a further relaxation of the 1976 offset for some pensioners.

The net impact of the exclusion of social security from the (A)(ii) language is to put sole control over offset of social security benefits under subsection (A)(i). Therefore, if a social security recipient returns to a former social security employer during his base period, social security benefits will be offset from unemployment benefits, but not otherwise. If a non-social security pensioner (on private or governmental pension) returns to a former employer during the base period, his pension will be offset from employment insurance only if his base period employment qualified him for eligibility or a higher level of pension. The (A)(ii) formula for offset of benefits when the base period of employment causes an incremental increase in the recipient's benefits does not apply to social security recipients.

Defendants' harsh interpretation of the language of (A)(ii) is not persuasive in light of its origin. Subsection (A)(ii) was added by the conference committee as a compromise measure and logically cannot be interpreted to deny social security recipients pension monies they would have received under both the House and Senate versions being considered by the conference committee.

### D. Consideration of Amendment in Final Form

■ During the Senate's final consideration and passage of H.R. 3904, Senator Williams commented on the changes made by the conference committee. He stated that the subsection (A)(i) language of the Senate amendment had prevailed, implying that (A)(i) was to continue to be interpreted as allowing an offset only under the condition that the employer responsible for social security benefits was also a base period employer. However, when the employer was the same, the offset would apply to social security benefits without the further limitations of subsection (A)(ii). 126 Cong. Rec. 26,040–41 (September 18, 1980).

Senator Bradley was one of the co-sponsors of H.R. 3904 in the Senate. After the bill emerged from the conference committee, Senator Bradley explained the bill in a final speech before the Senate vote. One of the examples he gave has strong relevance to the issue before this Court.

> [A]n individual at company A retires and begins to collect social security. For whatever reason, this person then goes to work for company B and, after six months there, is terminated. Assuming the individual is eligible for unemployment insurance because of the work done at company B, the level of unemployment insurance compensation will not be reduced at all. This is because the base period employer is not the same as the social security employer. The offset would apply, however, if the individual had returned to work for company A instead of working for company B. Under those circumstances, the base period employer and the social security employer would be the same.

126 Cong.Rec. S.12,901 (September 18, 1980).

Senator Bradley's remarks are entitled to great weight, because he was one of the sponsors of the amendment. "It is the sponsors that we look to when the meaning of the statutory words is in doubt." *National Woodwork Mfrs. Assn. v. NLRB*, 386 U.S. 612, 640, 87 S.Ct. 1250, 1266, 18

L.Ed.2d 357 (1967). "[R]emarks ... of the sponsor of the language ultimately enacted are an authoritative guide to the statute's construction." *North Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 526–527, 102 S.Ct. 1912, 1920–1921, 72 L.Ed.2d 299 (1982). In this case, the remarks of Senator Bradley leave no room for doubt as to the Senate's understanding and intent when it passed the amendments.

Likewise, Representative Frenzel, a House conference committee member, addressed the House of Representatives minutes before the final vote on (A)(i). Comparing the 1980 amendment to the 1976 total offset law, he said the language of (A)(i) "restricted the offsets and allowed most benefits to be paid without offset." 126 Cong.Rec.H. 9179 (September 19, 1980). If the conference committee had intended social security benefits to be offset in almost all cases, as envisaged by the defendants, Representative Frenzel would not have been able to make the strong statement that most benefits will be paid without offset under the new law.

It is the conclusion of this Court that Congress intended social security benefits to be offset only if the base period employer was the same as the social security employer and not when the base period employer merely participates in the federal social security system. This Court therefore accepts plaintiffs' interpretation and rejects defendants' interpretation of 26 U.S.C. § 3304(a)(15)(A)(i), concluding that the statute is ambiguous on its face. The Court further concludes that legislative history reveals a congressional intent consistent with plaintiff's interpretation and which allows a logical reading of the statute.

III. THE FUTA "WHEN DUE" REQUIREMENT

■ Plaintiffs allege that, by virtue of their unlawful administration of the pension offset statute, defendants are violating the "when due" provision of 42 U.S.C. § 503(a)(1). That section provides that the Secretary of Labor shall not certify funds for payment to any state unless the state laws include certain provisions, including "[s]uch methods of administration ... as are found by the Board [Secretary of Labor] to be reasonably calculated to insure full payment of unemployment compensation when due."

The congressional intent is to require the prompt payment of unemployment benefits as early as is administratively feasible. *Fusari v. Steinber*, 419 U.S. 379, 95 S.Ct. 533, 42 L.Ed.2d 521, *rehearing denied* 420 U.S. 955, 95 S.Ct. 1340, 43 L.Ed.2d 433 (1975); *California D.H.R. v. Java*, 402 U.S. 121, 130, 91 S.Ct. 1347, 1353, 28 L.Ed.2d 666 (1971). The time in question for § 503(a)(1) is the time the claimant is determined eligible at the first determination. *Gary v. Nichols*, 447 F.Supp. 320 (D.Idaho, 1978).

■ In this case plaintiffs do not allege failure of defendants to pay when due the unemployment benefits that were not offset. They merely contend that failure to pay the offset benefits violated the "when due" provision. Because the defendants paid the benefits they had determined to be due in a timely manner and failed to pay only amounts they determined were not due, this Court concludes that defendants did not violate the "when due" provision of 42 U.S.C. § 503(a)(1).

IV. DUE PROCESS CONSIDERATIONS

In asserting violation of their constitutional rights, plaintiffs first assert that their due process rights were denied because their unemployment insurance benefits were denied in an arbitrary and unlawful manner. This Court agrees that unemployment insurance benefits may be a protected property interest, the receipt of which requires that the state grant due process before removing the benefits. *Fusari v. Steinberg*, 364 F.Supp. 922 (D.Conn. 1973) (three judge panel), *vacated and remanded on other grounds*, 419 U.S. 379, 95 S.Ct. 533, 42 L.Ed.2d 521 (1975). Nevertheless, plaintiffs are not contesting lack of hearing or specific violations of due process. It is the defendants' interpretation

of the FUTA statute which prevented plaintiffs from receiving their benefits, not lack of due process.

## V. EQUAL PROTECTION CONSIDERATIONS

■ Next, plaintiffs assert that their equal protection rights were violated by a classification which treats social security pensioners at a distinct financial disadvantage compared to private or governmental pensioners. The state must administer its public benefit programs in an evenhanded manner and not utilize classifications which arbitrarily subject eligible recipients to different and discriminatory treatment. *Shapiro v. Thompson*, 394 U.S. 618, 633, 89 S.Ct. 1322, 1330, 22 L.Ed.2d 600 (1969). *See also Edelman v. Jordan*, 415 U.S. 651 n. 1, 94 S.Ct. 1347 n. 1, 39 L.Ed.2d 662 (1970). In this case, the plaintiffs' social security benefits were vested prior to their base period employment. Yet these rights were offset from unemployment insurance payments while pension benefits from non-social security funds were not offset, in accordance with defendants' interpretation of the FUTA statute.

■ In the areas of economic and social welfare, such as unemployment benefits, classifications created by law do not violate the Equal Protection clause if they bear a rational relationship to a legitimate state interest. *See Williamson v. Lee Optical Co.*, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955). Defendants contend that the rational state interest involved in this distinction is a fiscal interest. Defendants believe that the desire to save money is a rational reason for denying social security recipients financial benefits which all other pensioners receive when their base period employer is a new employer. This Court does not agree.

We recognize that a State has a valid interest in preserving the fiscal integrity of its programs. It may legitimately attempt to limit its expenditures, whether for public assistance, public education, or any other program. But a State may not accomplish such a purpose by invidious distinctions between classes of its citizens. It could not, for example, reduce expenditures for education by barring indigent children from its schools. ... The saving of welfare costs cannot justify an otherwise invidious classification. *Shapiro v. Thompson*, 394 U.S. at 633, 89 S.Ct. at 1330.

This Court does not contest the goal of financial responsibility as a worthwhile aim for a social welfare program. Nevertheless, "fiscal integrity" is not a legitimate banner behind which the defendants can hide in making discriminatory classifications in violation of the Equal Protection clause. Financial savings, if any, should be made equitably by treating all pensioners equally, not by singling out one group for discriminatory treatment and deprivation of benefits. If the Court accepted the interpretation suggested by defendants, the classification would violate the Equal Protection clause. The statute, however, is not void because it can be constitutionally interpreted, as this Court has interpreted it. The interpretation adopted by this Court has the threefold benefit of being constitutional, achieving the intentions of Congress, and rationally interpreting the words of the statute.

## VI. THE COLORADO STATUTE

■ Defendants contend that the federal statute sets a minimum pension-offset level which states may exceed, if they so choose, and that the Colorado statute does exceed the federal minimum. Plaintiffs assert that the federal statute sets a maximum pension-offset level and preempts the field and that, furthermore, the Colorado statute does not exceed the level of pension-offset established by the federal statute. This Court concludes that the question of whether the federal statute sets a minimum or maximum offset level is not at issue if the Colorado statute does not exceed the federal level.

The Court has considered the stipulations of the parties, the language of the Colorado statute, the interoffice memoranda of the Colorado Department of Labor and En-

ergy, the oral argument of the parties, and has concluded that Colorado intended to match its pension-offset provisions exactly to the federal model.

The stipulations of the parties, submitted with plaintiffs' Motion for Summary Judgment, address the issue of whether the Colorado pension-offset provision exceeds the federal level. "It is the practice and policy of the Defendants to deem the authority to reduce or offset unemployment insurance benefits under C.R.S. § 8–73–110(3) as identical to that existing under 26 U.S.C. § 3304(a)(15)(A)(i)." Joint Stipulation No. 47. This stipulation makes clear the belief of defendants that the Colorado provisions and authority to offset are "identical" to the provisions and authority of the federal statute.

The language of C.R.S. § 8–73–110(3) is very similar to the language of the federal statute, and its effect is the same. Nowhere in the language does the Colorado statute show an effort or intent to go beyond the offset level, be it minimum or maximum, established in subsection 3304(a)(15). Colorado did not opt to offset only 50 percent of social security benefits, in order to credit individual recipients with amounts which they contributed to their pensions, even though such a credit was expressly made optional for states in subsection 3304(a)(15)(B). In all other respects § 8–73–110(3) matches the federal provisions.

Furthermore, there is no indication in the interoffice memoranda of the Division of Employment and Training of the Colorado Department of Labor and Employment, which is entrusted with administration of the Colorado Employment Security Act, C.R.S. § 8–72–102, that the Department interpreted the Colorado law as exceeding the federal statute. Nor are defendants able to offer any legislative history supporting their allegations.

Finally, plaintiffs contend that, if the Division of Employment and Training had intended its regulations to exceed the level authorized by the federal statute, defendants would have had to comply with the notice and comment provisions of the Colorado Administrative Procedure Act (A.P.A.), C.R.S. § 24–4–103. The fact that defendants made no efforts to comply with the A.P.A. reveals that they did not believe that the Colorado provision exceeded the federally mandated pension-offset level.

## VII. THE EFFECTS OF *PENNHURST* and *EDELMAN*

As a final defense, defendants argue that the Court is divested of jurisdiction in this case by the Eleventh Amendment, as interpreted in *Pennhurst State School v. Halderman,* — U.S. —, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). In *Pennhurst* the Supreme Court held that the Eleventh Amendment bars suits against states for violation of state laws. This case, however, is not barred by the *Pennhurst* decision.

> The general rule is that a suit is against the sovereign if "the judgment sought would expend itself of the public treasury or domain, or interfere with the public administration," or if the effect of the judgment would be "to restrain the Government from acting, or to compel it to act."

— U.S. at —, 104 S.Ct. at 908 n. 11, 79 L.Ed.2d at 79 n. 11, citing *Dugan v. Rank,* 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963).

This is not a suit against state officials on the basis of state law. The unemployment insurance program is a joint federal-state program and the social security benefits which were offset are accrued through the federal social security program. The unemployment insurance benefits received by plaintiffs do not come from the state treasury; the unemployment insurance fund is a separate and distinct fund, not supported by state tax money. Statutory provisions make clear that the state and unemployment commission are not liable if the fund runs dry. C.R.S. § 8–77–104(5). This Court has already determined that the Colorado statute does not exceed the levels established in the federal law, but that the

offset authority under both provisions is identical.

The case at bar is governed by the analysis of the Supreme Court in *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). The Court in *Pennhurst* distinguished suits against state officials for violation of state laws from the *Edelman*-type case. *Pennhurst,* —— U.S. at ——, 104 S.Ct. at 911, 79 L.Ed.2d at 82. "Edelman held that when a plaintiff sues a state official alleging a violation of federal law, the federal court may award an injunction that governs the official's future conduct, but not one that awards retroactive monetary relief." 79 L.Ed.2d at 80. Because this suit primarily raises a federal question and involves violation of a federal law and the Equal Protection clause of the United States Constitution, *Edelman* precludes retroactive monetary relief but allows prospective injunctive relief.

## VIII. RELIEF

The Court will issue an injunction prohibiting defendants from continuing to interpret 26 U.S.C. 3304(a)(15)(A)(i) so as to require an offset of social security and railroad benefits from unemployment insurance benefits unless the base period employer is the same as the social security employer. Although an injunction is ordered as of this date, its effect shall be stayed for 90 days or until the Court of Appeals has had an opportunity to rule on this case if an appeal is taken.

Because of the requirements of *Edelman v. Jordan,* this Court will not issue retroactive monetary damages. For this reason, it is unnecessary to certify a class under Fed.R.Civ.P. Rule 23(b)(2). All potential class members will benefit from the injunction regardless of certification. Additionally, the Court notes that the parties have stipulated that the state unemployment insurance fund is in debt in the amount of approximately 40 million dollars. In this situation, an order of damages to the named plaintiffs could be required to be paid from the state general fund, which could adversely affect the state treasury in violation of *Pennhurst.*

For the reasons set forth above, it is

ORDERED that plaintiffs' Motion for Summary Judgment is granted as set forth in this opinion. It is

FURTHER ORDERED that defendants' Motion for Summary Judgment is denied. It is

FURTHER ORDERED that the Clerk shall enter judgment in favor of plaintiffs Thomas Edwards, Jeanette Caldwell, and John Vigil, and against defendants Ruben Valdez, John Kezer, and Industrial Commission of Colorado (Ex-Officio the Unemployment Compensation Commission), enjoining defendants, as of this date, from continuing their invalid and unconstitutional interpretation of the federal pension-offset provision. It is

FURTHER ORDERED that 26 U.S.C. § 3304(a)(15)(A)(i) shall be interpreted so as to require an offset of social security and railroad benefits from unemployment insurance benefits only if the base period employer is also the social security employer. It is

FURTHER ORDERED that this injunction is stayed for 90 days or until the United States Court of Appeals for the Tenth Circuit has ruled on the appeal of this case if an appeal is taken.